**UNITED STATES of America, Plaintiff,**

v.

**VILLAGE OF MARSHALL,
WISCONSIN, Defendant.**

No. 90–C–524–S.

United States District Court,
W.D. Wisconsin.

April 22, 1991.

Harvey L. Handley III, Housing and Civil Enforcement Section, Civil Rights Div., Dept. of Justice, Washington, D.C., for plaintiff.

Bradley D. Armstrong, Axley Brynelson, Madison, Wis., for defendant.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

The United States of America commenced this action pursuant to 42 U.S.C. § 3614(b) alleging that the defendant Village of Marshall, Wisconsin, discriminated against Tellurian U.C.A.N. in violation of 42 U.S.C. § 3604(f)(1) when it failed to grant an exception to a group home spacing requirement. Jurisdiction is based on 28 U.S.C. § 1345.

The action is presently before the Court on cross-motions for summary judgment. The parties have stipulated that all issues of liability be resolved upon a stipulated record of material facts. The following is a summary of the facts to which the parties have stipulated.

## FACTS

The defendant Village of Marshall is a Wisconsin municipality with a population of approximately 2,400. Tellurian U.C.A.N., Inc. is a private, non-profit corporation which provides services for mentally ill, chemically dependent, and other homeless persons in Dane County, Wisconsin.

In March 1989 Tellurian located a prospective house for use as a group residential facility for persons suffering from mental illness at 410 Hubbell Street, Marshall, Wisconsin. Subsequently, it contracted for an option to purchase the property. Tellurian intended to use the property as a community-based residential facility to be occupied by six unrelated individuals. The property was zoned R–2 by the Village zoning code, which would permit such a use.

Pursuant to its plan for a community-based residential facility, Tellurian sought funding from the United States Department of Housing and Urban Development. In connection with its application with HUD, Tellurian sought and received letters from the defendant confirming that the property was outside the 100–year flood plain and was appropriately zoned for the intended use.

On March 22, 1989, Eugene Dold, President of Tellurian, wrote a letter to the Marshall Village Board explaining the planned operation of the proposed group home. The letter advised that Tellurian was aware that it would be required to apply for an exception to a 2,500 foot spacing restriction. The Wisconsin Statute which creates the spacing restriction to which the letter refers is § 62.23(7)(i)(1), which provides:

> No community living arrangement may be established after March 28, 1978 within 2,500 feet, or any lesser distance established by an ordinance of the city, of any other such facility. Agents of a facility may apply for an exception to this requirement, and such exceptions may be granted at the discretion of the city.

At all relevant times there has been operating at 119 West Main Street, Marshall, a community-based residential facility known as the "Shady Rest Elder House," which has a present capacity of five elderly persons. Shady Rest is the only licensed community-based residential facility now operating in the Village. Shady Rest is approximately 1,619 feet from 410 Hubbell Street in a straight line. However, the two properties lie on opposite sides of a wide unbridged portion of the Maunesha River and the shortest distance of travel between the two properties via public streets is approximately one-half mile.

At a regularly scheduled Village Board meeting on April 11, 1989, a number of citizens appeared in opposition to the Tellurian group home. The citizens raised a number of questions concerning the group home. The following is an excerpt from the minutes of the Board meeting:

> The residents wanted the process stopped now. Mr. Meloy reaffirmed that the Village could not take any action, since no application for permit had been applied for and there was no official action for them to take. The immediate neighborhood was very opposed of having the home there at all.... [Board member] Hensler asked if it would be proper on the Village's part to notify Tellurian that there is no desire to have their facility in the Village. Mr. Meloy felt that a letter could be wrote [sic] to Tellurian stating that the residents had appeared at the Board meeting and were opposed to their project. Motion by Hensler, second by Wild, to send a correspondence to Tellurian that many residents appeared at the Board meeting and strongly opposed their plan and state the concerns mentioned with their disapproval. Roll call vote carried, 7–0.

No Village Board member was involved in preparing the list of concerns presented at the April 11th Board meeting. Village Board President Prust distributed to those in attendance at the April 11, 1989 Board meeting copies of a letter dated March 22, 1989, from Tellurian President Dold explaining the proposed program Tellurian intended to establish in Marshall. Mr. Dold was not in attendance at the April

11th meeting. Village Clerk Peck sent a letter dated April 12, 1989, to Tellurian President Dold pursuant to the direction of the Village Board. The letter stated as follows:

I was directed by the Marshall Village Board to write you this letter regarding the Board meeting that was held last evening.

The regular Village Board meeting for the month of April was called to order at about 7:30 P.M. In attendance were approximately 40 concerned citizens, who were at the meeting, to voice their opposition to your proposed CBRF at 410 Hubbell Street in the Village of Marshall. It was the unanimous opinion of those in attendance that the Village Board should deny any request for such facility in the Village. Those in attendance were given a copy of your letter to the Board, dated March 22, 1989. Some of those people may be calling you in person.

The Board listened attentively to all of those who spoke in opposition. No one spoke in favor. The Board took no official action other than to direct me to write you to indicate that there is a strong and perhaps unanimous community sentiment opposing your proposal.

A copy of the Board minutes and meeting register have been enclosed for your reference.

Subsequent to the April 11, 1989, Village Board meeting Tellurian President Dold received a number of letters and phone calls from persons expressing opposition to the proposed group home.

During the summer of 1989 a number of residents of the Village organized to oppose Tellurian's proposed CBRF, and retained an attorney for that purpose.

On August 25, 1989, the Wisconsin Housing and Economic Development Authority sent a letter to Dold stating that HUD had approved a grant of funds in the amount of $245,644 for the operation of a group home at 410 Hubbell Street, Marshall. In August 1989 Mr. Dold informed Village President Prust that Tellurian's grant request had been approved. On September 12, 1989, the Marshall Village Board at its regularly scheduled meeting determined to prepare and send a letter to Dold advising him that the proposed CBRF was within 2,500 feet of an existing CBRF and that, pursuant to State law, an exception would be necessary. A letter to this effect was sent to President Dold, advising him of the procedure for applying for an exception.

By letter dated September 28, 1989, Dold applied for an exception to the 2,500 foot spacing requirement. The request was placed on the agenda for the October 10, 1989 Village Board meeting, and Dold was sent a copy of the agenda.

At the October 10, 1989 Village Board meeting the Board determined to treat Tellurian's application for a statutory exception with the procedure used for conditional use permits. A public hearing on the application for a statutory exemption was scheduled for October 26, 1989. Village President Prust indicated that the purpose of the October 26th hearing would be to "hear evidence on the impact of having another community based residential facility within 2,500 feet of another such facility."

At the October 10th meeting Village Board members requested that legal counsel provide information relating to Tellurian's application or to assist the Board members in evaluating it. In response, legal counsel provided to the Village Board members, prior to the October 26th hearing, portions of the legislative history of § 62.-23(7)(i)(1), Wis.Stat., as well as several Law Review articles relating to community based group homes. A notice of the October 26th Board meeting was prepared and sent.

On October 24, 1989, the Village Board held a meeting at which the Board members requested that legal counsel provide guidelines to assist Board members in evaluating comments which might be made at the October 26th public hearing. In response to the request by Board members, legal counsel prepared a letter dated October 26, 1989, which was distributed to the Board members prior to the hearing. The following is an excerpt from that letter:

The Board's primary focus should be on the effect and impact to the neighbor-

hood which may result from having two community living arrangements (CLA) within 2,500 feet of one another.... The Board's decision on whether to grant or deny the exception is a zoning decision, and as such, must be related to the promotion of the "health, safety, morals, prosperity, aesthetics, and general welfare of the community.

The United States Supreme Court has stated that a municipality's zoning decisions may not be based on unfounded stereotypes, biases, fears or prejudices toward a group of individuals such as the mentally ill. (Citations omitted.) Additionally, the Fair Housing Amendments Act of 1988 (citation omitted), the Federal Fair Housing Law, prohibits a municipality from denying housing to those with handicaps *because of the handicap.* ... The legislative history of § 62.-23(7)(i), Stats., indicates that the purpose *of this section is to provide to those who* are institutionalized the benefits of living in normal residential settings. To maximize the rehabilitative effort of community-based residential living, the legislative history states that "community living arrangements should be located in a residential area which does not include numerous other such facilities."

On October 26, 1989, the Village Board held a public hearing on Tellurian's application for an exception. Approximately 80 persons were in attendance at the meeting. Tellurian President Dold and a number of residents spoke at the public hearing. Several of those who spoke in opposition to the granting of an exception were applauded. Those who spoke in opposition generally discussed concerns over potential violence and crime as a result of the group home, as well as sentiment that exceptions to zoning laws should generally not be granted. After the public hearing was closed the Board entered into public deliberations. The following is the portion of the transcript relating to the public deliberations:

Henry—Well, according to that map, that 1,600 foot deal, looks to me like we are right in a very dense, you're talking about density, populous part of the Village which concerns me. Which gets back to the State law. If it was out here, or something you know.

Prust—Any other questions? I guess the point might be put here, that there are areas within the Village which fall outside of the 2,500 feet, that such a facility could be located on. So we aren't in the sense within that 2,500 closing the community to another facility, if that's what we're relating all this back to, the 2,500 feet.

Hensler—Well, I think we've got to presume that the State Legislature enacted this bill, they had a good reason for it and I think they do in that order. For the concern of human and everyday residential atmosphere and a few other things like Mr. Dold said in such in doing that. That's my concern also in doing it, and I think it's a good law and I think it's there to benefit everybody concerned, especially the group homes. I think it gives them a place to have it and to keep that continuity in a residential area like we want in the first place.

Keefer—I guess the thing that bothers me is if we put two group homes within 1,600 feet of each other and we okay this, and another group home comes in within say, in the middle between the two, at 800 feet, then you've got three homes within 1,600 feet. And that's what bothers me.

Hensler—I agree.

Hyman—And I also have another factor that I think it was presented by Newton, is that they were very careful within their group home to stay within a 2,500 foot section of another home, and I'm not sure why these people have requested to break that (not audible). Because one group home does look out for the other (not audible).

Shaker—I just want to say, I can certainly understand the citizens' concern, but I think our issue is the 2,500 feet, and I agree with Wayne's concern that if we would grant this, then we could have somebody else coming in for a closer look.

Prust—The important part is the Constitution. If the law is found to be uncon-

stitutional, we will have no say in the future, but at the present time, it's our deliberation as to whether that law is constitutional or not constitutional in the granting of this exception.

Hensler—Right. In his own words, basically if there is two or three or four group homes together it's no good. That's why the law was enacted to do such in doing so. I guess I'd make the motion that we deny the variance, the exception, to Tellurian of the 2,500 foot.

The motion carried unanimously.

The October 26, 1989, meeting was held at a school gymnasium because the municipal building at which meetings are normally held would not accommodate the number of persons whose attendance was anticipated. The request for an exception for a group home aroused more opposition from residents than any other proposal to come before the Board within the experience of President Prust, who was familiar with the operations of the Board since 1986.

## MEMORANDUM

The sole issue before the Court, to be resolved on the documentary record before it, is whether the actions of the Marshall Village Board constitute wrongful discrimination within the meaning of the 1988 amendments to the Fair Housing Act. The applicable statutory language, 42 U.S.C. § 3604(f), is as follows:

... It shall be unlawful

\* \* \* \* \* \*

(f)(1) to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

\* \* \* \* \* \*

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available;

\* \* \* \* \* \*

(3) For purposes of this subsection, discrimination includes—

\* \* \* \* \* \*

(B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.

Plaintiff advances two arguments in support of its contention that the defendant discriminated against Tellurian on the basis of the handicap of its potential residents. First, plaintiff contends that the decision of the Board to deny the exception was the result of intense public pressure opposing the project because of the desire to exclude mentally ill from the community. Second, plaintiff asserts that the failure to grant an exception constituted a refusal to make reasonable accommodations in rules, policies, practices or services within the meaning of § 3604(f)(3)(B). Defendant denies any discriminatory motive and asserts that § 3604(f)(3)(B) is inapplicable to it as a municipality exercising legislative discretion.

Two distinct issues are presented in analyzing the applicability of § 3604(f)(3)(B). The first is whether the statutory spacing requirement for group homes constitutes a rule, policy or practice within the meaning of that section. Second, if the legislation does constitute a rule, policy or practice it must be determined whether the granting of an exception in this instance would have been a "reasonable accommodation necessary to afford such person equal opportunity to use and enjoy a dwelling."

The language of the statute is the starting point in determining whether this provision applies to the Wisconsin Statute requiring 2,500 foot spacing between community living arrangements. *Southeastern Community College v. Davis*, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979). The terms "rules, policies, practices, or services" used in their ordinary sense are sufficiently broad to encompass a legislative enactment of the type presented here. A rule is "an established standard, guide, or regulation." Black's Law Dictionary 1331 (6th ed. 1990). Policy is "the general principles by which a government is guided in its management of public affairs, or the legislature and its measures." *Id.* at 1157. Either of these concepts are broad enough to encompass a

statute which prescribes the required spacing between group home facilities. Common usage of the terms in question would indicate that the statutory prohibition against locating community living arrangements within 2,500 feet of another are both rules and policies. The fact that the rule has been established by legislative enactment does not place it outside of this commonly understood definition.

Reference to the legislative history of the 1988 amendments to the Fair Housing Act fully confirms this interpretation. House Report No. 100–711, 100th Cong., at 24, *reprinted in* 1988 U.S.Code & Admin.News 2173, 2185 (1988) contains the following language pertaining to the Fair Housing Amendments Act:

> The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices. The Act is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of limiting the ability of such individuals to live in the residence of their choice in the community ...

> Another method of making housing unavailable to people with disabilities has been the application or enforcement of otherwise neutral rules and regulations on health, safety, and land use in a manner which discriminates against people with disabilities. Such discrimination often results from false or over-protective assumptions about the needs of handicapped people, as well as unfounded fears of difficulties about the problems that their tenancies may pose. These and similar practices would be prohibited.

> New § 804(f)(3) sets out specific requirements to augment the general prohibitions under (f)(1) and (2). These include provisions regarding "reasonable modifications to existing premises," "reasonable accommodation," and accessibility features in new multi-family housing constructions.

It is clear from this language that Congress anticipated that there were rules and regulations encompassing zoning regulations and governmental decisions about land use. Accordingly, the legislative history confirms the ordinary sense of the words.

Furthermore, in the only case discovered where the issue was raised, it appears that the Court, without contrary argument from the parties, assumed that § 3604(f)(3)(B) applied to a township zoning variance determination. *Devereux Foundation, Inc. v. O'Donnell*, 1990 WL 132406 at 9, n. 12, n. 14, 1990 U.S.Dist.Lexis 11831 at 13, n. 12, n. 14 (E.D.Pa., 1990).

In opposing the application of this provision the defendant contends that the Fair Housing Amendment Act was not intended to impinge upon the exercise of legislative discretion. The legislative history clearly supports the position of Congress that it had no concern about interfering with legislative discretion. To the contrary, Congress expressly stated that it intended to limit legislative discretion where the effect of the exercise of such discretion is to discriminate against individuals with handicaps. In fact, Congress specifically rejected an amendment which would limit interference with legislative discretion despite warnings from the proposal's opponents that this interference would indeed be substantial.

> My amendment provided that if a locality or state decides to zone real property as available for certain uses, such as commercial development or single-family homes, or fails to zone real property with the particular classification, such a zoning decision is not a violation of the Fair Housing Act unless the decision was made with intent to discriminate on the basis of race or other prohibited criteria under the Act. Similarly, the amendment mandated that if [sic] a local or state zoning grant or refusal to grant a variance is not a violation of the Act unless undertaken with discriminatory intent.

H.R.Rep. No. 100–711 at 89, 1981, U.S.Code & Admin.News at 2224.

Furthermore, the House Committee directly stated its intent to limit Legislative discretion in this area:

These new subsections would apply to state and local land use and health and safety laws, regulations, practices or decisions which discriminate against individuals with handicaps. While state and local governments have authority to protect safety and health, and to regulate use of land, that authority has been sometimes used to restrict the ability of individuals with handicaps to live in communities.

*Id.* at 24, 1988 U.S.Code & Admin.News at 2185.

Accordingly, it is clear that Congress intended to limit the exercise of legislative discretion where the effect was to discriminate against the handicapped and was well aware of the extent to which it limited such legislative discretion.

Defendant also relies upon several regulations adopted by the government pursuant to the Fair Housing Amendments Act. First, defendant contends that 24 C.F.R. § 100.204 (1990) by referencing the term "person," intends to exclude municipalities. The Court finds no support for this argument. The term "person" as used in the Act and regulations clearly includes municipalities. The Court find no support for this argument. The term "person" as used in the Act and regulations clearly includes municipalities. *Bellwood v. Gladstone Realtors,* 569 F.2d 1013, 1020, n. 8 (7th Cir. 1978) aff'd, in part, *Gladstone Realtors v. Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).

Second, defendant contends that because the two examples of the application of § 3604(f)(3)(B) contained in 24 C.F.R. § 100.204(b) do not refer to zoning or land use decisions, by implication the provision was not intended to cover them. There is no suggestion in the regulations that they are intended to be exhaustive of the application of the section. Furthermore, it is not surprising that the regulations do not refer to any land use situation as an example since the Secretary has determined that its regulations do not encompass land use

decisions which are statutorily referred to the Attorney General for appropriate action. 24 C.F.R. Ch. 1, Subch. A, App. I at pp 578–79. "Since the Secretary has no power to issue a charge of discrimination in matters involving zoning or other land use law, the Department believes it would be inappropriate to address this specific issue in the regulations." *Id.*

Accordingly, the Court determines that § 3604(f)(3)(B) applies in the present situation where a local government entity is granted legislative authority to determine whether a variance from an established rule is appropriate. The next issue to be addressed is whether the defendant failed to make a reasonable accommodation when it denied the statutory exception.

■ In general, a "reasonable accommodation" is one which would not impose an undue hardship or burden upon the entity making the accommodation, *Majors v. Housing Authority of DeKalb,* 652 F.2d 454, 457 (5th Cir.1981), and would not undermine the basic purpose which the requirement seeks to achieve. *Doherty v. Southern College of Optometry,* 862 F.2d 570, 575 (6th Cir.1988).

■ In this case no evidence was apparently presented to the Board that permitting the development of a group home at the Hubbell Street location would impose any cost or expense upon the Village. The only evidence before the Board was that the group home would continue to pay taxes and would not require additional services from the community.

Neither was there evidence in the record or any indication that the Board members considered that the location of a group facility at Hubbell Street would undermine the purpose of the Wisconsin spacing statute. The Board was presented with substantial legal advice and considered the legislative history which accompanied the enactment of § 62.23(7)(i), including the following summary of the Legislation's purpose:

It is the legislature's intent to promote public health, safety and welfare by enabling persons who otherwise would be

institutionalized to live in normal residential settings, thus hastening their return to their own home by providing them with the supervision they need without the expense and structured environment of institutional living. To maximize its rehabilitative potential, a community living arrangement should be located in a residential area which does not include numerous other such facilities. The residents of the facilities should be able to live in a manner similar to other residents of the area.

\* \* \* \* \* \*

The legislature believes these matters are a state-wide concern and can be achieved only by establishing criteria which restrict the density of community living arrangements while limiting the types of and number of facilities which can exist in residential neighborhoods having appropriate atmosphere for the residents, thereby preserving the established character of a neighborhood and community.

1977 A.B. 383, 1977 Wis.Laws Ch. 205, § 1.

The evidence upon which the Board based its decision did not support a finding that an exception in this case would undermine the purpose of the statute. In fact, the evidence was that while technically within the 2,500 foot radius, the effective distance between the properties was in excess of the 2,500 foot requirement by virtue of the presence of the Menausha River. There was no evidence presented at the hearing to indicate that the presence of two relatively small group facilities would create the type of density which the Wisconsin legislature sought to avoid. Board members were, instead, concerned with the precedent which might be established for a potential third home in this radius, "the foot in the door" approach.

The public comments of the Board members concerning their concern that a subsequent additional community-based residential facility would be sought were not relevant to its determination of the present facility. In fact, the public discussion by the Board members is probably best characterized as a strict adherence to the 2,500 foot rule in deference to the legislative determination that this was appropriate. Such strict adherence to a rule which has the effect of precluding handicapped individuals from residing in the residence was precisely the type of conduct which the Fair Housing Amendment Act sought to overcome with the enactment of § 3604(f)(3)(B).

> A discriminatory rule, policy, practice or service is not defensible simply because that is the manner in which such rule or practice has traditionally been constituted. This section will require that changes be made to such traditional rules or practices if necessary to permit a person with handicaps an equal opportunity to use and enjoy a dwelling.

1988 H.R.Rep. 100–711, at 25, U.S.Code Cong. & Admin.News at 2186.

Since the evidence before the Board contained nothing that could support a finding that the location of the group home at 410 Hubbell Street would have any significant adverse impact on the legitimate goals of the Wisconsin Statute or would impose any expenses or burden upon the Village, failure to grant the exception constituted a failure to make reasonable accommodation as required by § 3604(f)(3)(B) and, consequently, was an act of discrimination as defined in the Fair Housing Amendments Act.

### ORDER

IT IS ORDERED that plaintiff's motion for summary judgment on the issue of liability is GRANTED.

IT IS FURTHER ORDERED that defendant's motion for summary judgment is DENIED.