**SMITH & LEE ASSOCIATES, INC., a/k/a Mortenview Manor, a Michigan Corporation; United States of America, Plaintiffs–Appellees,**

v.

**CITY OF TAYLOR, MICHIGAN, Defendant–Appellant.**

No. 92–1903.

United States Court of Appeals, Sixth Circuit.

Argued May 3, 1993.

Decided Dec. 30, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied March 11, 1994.*

---

* Contie, Senior Circuit Judge, would grant rehear-     ing for the reasons stated in his dissent.

**922**

Gregory J. Bator (argued & briefed), Smith & Lee Associates, Birmingham, MI, for plaintiff-appellee.

Stephen J. Markman, U.S. Atty., Detroit, MI, David K. Flynn, John R. Dunne, Gregory B. Friel (argued & briefed), U.S. Dept. of Justice, Civil Rights Div., Appellate Section, Washington, DC, Paul F. Hancock, Barbara Burr, Sharon Bradford Franklin, U.S. Dept. of Justice, Civil Rights Div., Washington, DC, for U.S.

Patrick B. McCauley, Patrick J. Burkett (argued & briefed), Alan B. Koenig, Sommers, Schwartz, Silver & Schwartz, Southfield, MI, for defendant-appellant.

David M. Davis (briefed), Hardy, Lewis, Pollard & Page, Birmingham, MI, for Michigan Municipal League amicus curiae.

Before: KENNEDY and SILER, Circuit Judges; and CONTIE, Senior Circuit Judge.

KENNEDY, Circuit Judge.

The City of Taylor appeals from the District Court's decision granting judgment to plaintiffs on their claims against the City under the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 et seq. (the "FHAA"). The court found that the City had intentionally discriminated against handicapped persons and that it had failed to make reasonable accommodations to provide handicapped individuals with an equal opportunity to use the housing of their choice in violation of the handicap provisions of the FHAA. This case raises the issue of whether the FHAA's directive to make reasonable accommodations imposes affirmative obligations upon municipalities to amend neutral zoning laws that may have the effect of denying the handicapped equal access to housing. For the reasons that follow, we reverse and remand this case to the District Court.

## I. Background

### A.

Smith & Lee Associates ("Smith & Lee") is a for-profit Michigan corporation that owns and operates Adult Foster Care ("AFC") homes, including Mortenview Manor in Taylor, Michigan, the one involved in the instant case. An AFC home provides twenty-four hour supervised care to dependent adults who require ongoing supervision, but not continuous nursing care. Mortenview Manor is a one-story dwelling, and includes a kitchen, living room, dining room, six bedrooms, two full baths, and a small office. Currently it houses six elderly and disabled residents who suffer from Alzheimer's disease, senile dementia, organic brain syndrome, as well as other ailments associated with growing old. Under a Michigan statute, its operation with six handicapped individuals is considered to be a residential use and is not in issue. Smith & Lee contends that it is economically infeasible to operate the home with only six residents and seeks to increase the number of residents to twelve.

Mortenview Manor is located in a single-family residential area, designated "R–1A" by Taylor's zoning ordinance. Under Mich. Comp. Laws § 125.583b(2), an AFC home for six or fewer residents is considered a residential use permitted in all residential zones including single family, a statewide accommodation for the handicapped.

That section provides:

In order to implement the policy of this state that persons in need of community residential care shall not be excluded by zoning from the benefits of normal residential surroundings, a state licensed resi-

dential facility[1] providing supervision or care, or both, to 6 or less persons shall be considered a residential use of property for the purposes of zoning and a permitted use in all residential zones, including those zoned for single family dwellings, and shall not be subject to a special use or conditional use permit or procedure different from those required for other dwellings of similar density in the same zone.

MICH.COMP.LAWS § 125.583b(2). A new AFC facility accommodating more than six residents, however, must receive municipal approval before the state will issue a temporary license.[2] The Michigan Adult Foster Care Facility Licensing Act ("AFCFLA"), MICH. COMP.LAWS § 400.716(2).

The City gives two reasons why Mortenview Manor may not operate with more than six residents. First, the residents do not constitute a family as family is defined in Taylor's zoning ordinance, nor do they fall within the statutory exception to local zoning laws created by section 125.583b(2) since they number more than six, therefore, they do not meet the requirements for a R–1A single-family district. Second, the City categorizes a for-profit AFC facility of seven or more residents as a multiple-family dwelling permitted in multiple-family residential districts designated as RM–1 and RM–2. Special land uses in both districts expressly include housing for the elderly.

From the start, Smith & Lee sought to house twelve residents in the home. In September, 1989, the City refused to issue a building permit for renovations for the home because it believed that a twelve-person AFC home could not operate in a R–1A zone.[3] Michael Manore, Director of the Office of Development Services, informed Smith & Lee that the home could not operate with twelve residents unless the City rezoned the property to a RM–1 area. The City then issued the building permit with the express limitation: "SINGLE FAMILY RESIDENTIAL USE ONLY." After inspection of the home, the Department of Social Services ("DSS") licensed it for six residents and the home opened in December, 1990.

In January, 1990, Smith & Lee petitioned the City to rezone Mortenview Manor to a RM–1 district. Taylor officials referred the petition to its planning consultant, Wade/ Trim Impact, which recommended denial of the request for three reasons: 1) RM–1 zoning would be inconsistent with the established zoning pattern of the neighborhood; 2) RM–1 zoning would allow for land uses that are incompatible with the established single-family residential character of the neighborhood; and 3) the request was inconsistent with the recommendation of the City's Master Land Use Plan 2000.

A public hearing before the Taylor Planning Commission was held on February 21, 1990. There were no objections from surrounding residents at the hearing. The Commission, however, voted to recommend to the City Council that the petition be denied. At a March 5, 1990 study session, the City Council discussed Smith & Lee's rezoning request. Smith & Lee advised the members of the City Council, as it had the Planning Commission, that denial of the rezoning petition might be in violation of the FHAA. A representative of the Michigan Residential Care Association made a presentation on behalf of Smith & Lee and explained the impact of the FHAA on the action. Some of the Council members were informed that the DSS would issue the license for twelve residents if the City were to give its permission in a letter and that the City need not rezone the area. At its March 6, 1990 meeting, the Council denied the rezoning request, citing concerns over spot zoning and inconsistencies

---

1. A "state licensed residential facility" is defined to include licensed AFC facilities that provide services for six or fewer residents. MICH.COMP. LAWS § 125.583b(1).

2. A new AFC facility must first obtain a temporary license to operate. After six months, a facility must be granted a regular license in order to continue to operate. See MICH.COMP LAWS § 400.-714(1).

3. When purchased, the Mortenview home included a kitchen, living room, dining room, family room, three bedrooms and one and one-half baths. Smith & Lee remodeled the home by converting the garage and family room into three additional bedrooms and a small office, and by expanding the former half-bath into a second full bath.

with the City's master development plan. Smith & Lee attempted to get a vote by the Council on the letter of permission proposal, but the Chairman never put that proposal to vote.

## B.

On May 10, 1991, Smith & Lee instituted this action against the City alleging violations of the FHAA, 42 U.S.C. §§ 3604(f)(1)(B), 3604(f)(3)(B) and 3617. The United States instituted a similar action shortly thereafter and the District Court consolidated the two cases. After a bench trial, the court issued its opinion on July 15, 1992. The court found no violation of section 3617[4], but found discrimination by the City in violation of sections 3604(f)(1)(B) and 3604(f)(3)(B). The court enjoined the City to send a letter to the DSS stating that Smith & Lee has Taylor's permission to operate the AFC home for twelve residents, and permanently enjoined the City from refusing to permit and interfering with the operation of the home. The court also ordered the City to pay damages in the amount of one-hundred and fifty-two thousand dollars ($152,000) to Smith & Lee (its profits if it had been permitted to operate with twelve residents instead of six, plus some expenses incurred), and a civil penalty of fifty thousand dollars ($50,000) to the United States under 42 U.S.C. § 3614(d)(1)(C)(i). The City timely appealed. On August 14, 1992, a panel of this Court issued a stay of the injunctive relief and of the execution of the monetary relief without bond pending appeal.

## II.[5]

The FHAA prohibits excluding disabled persons from housing because of their dis-

---

**4.** Section 3617 provides in full:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.
42 U.S.C. § 3617 (West Supp.1992).

**5.** The District Court found that:

Taylor is not exempt from the Fair Housing Act under 42 U.S.C. § 3603(b)(1) because this

ability and requires that reasonable accommodations necessary to ensure the handicapped equal housing opportunities be made. 42 U.S.C. §§ 3604(f)(1) and 3604(f)(3)(B). This Court has applied the FHAA to municipal zoning ordinances that affect housing opportunities for the disabled. *Marbrunak, Inc. v. City of Stow, Ohio*, 974 F.2d 43 (6th Cir.1992). We have also held that the Act applies to discriminatory actions taken by municipalities pursuant to zoning ordinances. *See United States v. City of Parma, Ohio*, 661 F.2d 562, 571–72 (6th Cir.1981) (pre–1988 version of the Fair Housing Act also covered municipal zoning actions), *cert. denied*, 456 U.S. 926 (1982). Other courts have found that the reasonable accommodation provision found in section 3604(f)(3)(B) applies to municipal zoning variance procedures. *See Parish of Jefferson v. Allied Health Care, Inc.*, 1992 WL 142574 (E.D.La.1992); *United States v. Village of Marshall, Wis.*, 787 F.Supp. 872, 878 (W.D.Wis.1991) (where local government has legislative authority to determine whether to grant a variance).

Section 3604(f) provides that it shall be unlawful:

(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—

(A) that buyer or renter;

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that buyer or renter.

. . . .

provision is applicable only to the sale and rental transactions of single family homeowners and not of municipal actions affecting single family homes. Additionally, Taylor is not exempt under 42 U.S.C. § 3607(b)(1), which permits reasonable restrictions regarding the maximum number of occupants permitted to occupy a dwelling. Nothing in Taylor's zoning ordinance, including its definition of family, places restrictions on the maximum number of occupants.
Defendant claims that the latter finding was in error. We believe that the District Court was correct in holding defendant non-exempt from the FHAA.

(3) For purposes of this subsection, discrimination includes—

....

(B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling....

42 U.S.C. §§ 3604(f)(1)(B), (f)(3)(B) (West Supp.1992). The District Court found that the City discriminated under both subsections (1) and (3).

Initially, we consider the City's zoning laws as rules within the meaning of section 3604(f)(3)(B). Taylor defines "family" in its zoning ordinance as follows:

a. [A]n individual or group of two or more persons related by blood, marriage or adoption, together with foster children and servants of the principal occupants, with not more than one (1) additional unrelated person who are domiciled together as a single, domestic, housekeeping unit in a dwelling unit, or

b. A collective member [sic] of individuals domiciled together in one (1) dwelling unit whose relationship is of a continuing nontransient domestic character and who are cooking and living as a single nonprofit housekeeping unit. This definition shall not include any society, club, fraternity, sorority, association, lodge, coterie, [or] organization....[6]

Zoning Ordinance, § 2.02(36). Because Mortenview Manor is a *for-profit* housekeeping unit, the residents do not meet the requirements of a family under section 2.02(36) of Taylor's ordinance. Further, because Smith & Lee seeks to house more than six residents, the home does not meet the statutory exception to local zoning laws relating to AFC facilities with six or fewer residents found in MICH.COMP.LAWS § 125.583b(2).

■ Under both the United States and the Michigan Constitutions, a local municipality has wide-ranging discretion in regulating land use within its borders. *See Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926) ("[B]efore [a zoning] ordinance can be declared unconstitutional ..., [it must be shown to be] clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."). In *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), the United States Supreme Court upheld an ordinance that defined a "family" as not more than two unrelated persons, living and cooking together as a single housekeeping unit. Because the Court found that the ordinance involved no "fundamental right," it reviewed it for arbitrariness to ensure that the ordinance was rationally related to a permissible state objective. "It is said, however, that if two unmarried people can constitute a 'family,' there is no reason why three or four may not. But every line drawn by a legislature leaves some out that might well have been included. That exercise of discretion, however, is a legislative, not a judicial, function." *Id.* at 8, 47 S.Ct. at 1540 (footnote omitted). We find that Taylor's definition of a "family" is a constitutional exercise of its legislative discretion to zone a residential neighborhood.

## A. Intentional Discrimination

The District Court found the alleged intentional discrimination by Taylor officials against the proposed residents of Mortenview Manor to be "obvious." The court gave the following as evidence of the City's intent: 1) the officials' in-court discriminatory interpretation of the single-family requirement; 2) the City's allegedly misleading information that the only way the City could permit Mortenview Manor to operate with twelve residents was to rezone for multiple-family use; 3) the City's refusal to permit Mortenview Manor, a for-profit enterprise to operate, while at the same time allowing other for-profit businesses to operate out of the

---

**6.** Instead of setting a limit on the number of unrelated individuals who may live together and still be considered a family, as other ordinances do, Taylor's definition of family focuses instead on whether a household is run as a unified, non-profit housekeeping unit. This approach obviates the need for policing homes to determine whether persons living together are married or not.

same neighborhood; 4) the City's alleged history of discrimination against the handicapped; and 5) the testimony of Taylor officials.

### 1. Interpretation of Non–Profit Status Requirement

■ The court held that the City has interpreted the non-profit requirement of the single family definition in a discriminatory manner. Two Taylor officials testified that under their understanding of the ordinance, twelve unrelated people could rent a home in a single-family neighborhood from a profit-making landlord and would be considered a family even if they hired someone to cook and clean for them. The District Court viewed this testimony as evidence of intentional discrimination because the City viewed Mortenview Manor as a for-profit venture, but viewed the hypothesized twelve person group as non-profit. We believe the District Court erred in this determination of discrimination. Zoning laws regulate land use. The City's zoning ordinance requires that a single-family home operate as a "non-profit housekeeping unit." Whether a home is owned or rented does not effect whether it is being *used* in a profit-making or non-profit-making manner. Smith & Lee is running a commercial enterprise out of the home, while a group of unrelated persons who rent a home owned by a profit-making landlord is not. While no City Council member was able to articulate a distinction between the former and latter situations, we believe that a meaningful distinction does exist. In the latter case, where a group of unrelated persons rent a home from a profit-making landlord, these persons, as lessees, hold a possessory interest in the property, namely a leasehold interest. We therefore look to the lessees' use of the home, which is residential and not for profit. In the case of Smith & Lee, which owns the home, it has not transferred any property interest to its residents and holds the possessory interest in the property. We therefore look to Smith & Lee's use of the home. A rooming house, where meals and rooms are furnished for compensation, is a profit-making enterprise. Although provided for the handicapped, the home here is indistinguishable from a rooming house. Thus, as a profit-making enterprise, Mortenview Manor cannot operate with twelve residents in a R–1A zone under Taylor's ordinance, while twelve unrelated individuals can rent a home and live as a "family" under the ordinance (so long as they do not use the home in a profit-making manner). The court was not justified in concluding that the Taylor officials discriminated in their interpretation of the ordinance.

### 2. Rezoning Requirement

■ The District Court viewed the "series of demands upon Smith & Lee, in attempting to gain approval for its proposal [as] circumstantial evidence highlighting the City's pretextual rationales and thus its discriminatory intent." The court believed that the City's instruction to Smith & Lee to request rezoning of the property from a single-family to multiple-family district doomed the request from the start because the City could then hide its discrimination behind spot zoning concerns. The court stated that "no official has proffered a clear reason why rezoning it to a multiple-family use was appropriate, especially since the Zoning Ordinance does not address AFC homes and ... [because] Mortenview Manor fits the R1–A zone's family definition but for its profit status. This requirement was not rational given that the AFC home for twelve does not fit any of the Zoning Ordinance's definitions of permitted uses in a RM–1 district."

While it is true that Taylor's zoning ordinance does not include a definition of *permitted uses* in a RM–1 district for an AFC home for twelve, homes for the elderly as well as convalescent and nursing homes are permitted as *special uses* [7] in RM–1 districts. Zoning Ordinance § 7.03. Additionally, evidence that the court refused to admit showed that an AFC home for twelve was permitted by the City in a RM–1 district. Indeed, the City had rezoned the area from R–1A to

---

7. Special land uses are permitted only after review and approval by the City's Planning Commission. Zoning Ordinance § 2.02(92).

RM–1 pursuant to a request by the home operators to permit that home. We believe the rezoning requirement was rational and indeed necessary[8]; to consider this requirement evidence of discrimination was error.

### 3. Discriminatory Application of Non–Profit Requirement

Plaintiffs next argue that the City is applying the non-profit requirement to Smith & Lee in a discriminatory fashion. It is undisputed that two for-profit businesses, Cargill's Portable Welding and MTM Installations, operate out of single-family homes on Mortenview Drive. MTM is next door to Mortenview Manor. The City does not allege that it was without knowledge of the presence of these businesses and has not taken any action to shut them down. The District Court found that "[n]ot one official has articulated a legitimate reason why the Mortenview home, even if considered for-profit, cannot operate, but other for-profit endeavors can." The court noted that one councilwoman admitted that she runs a for-profit business out of her single-family home. The record indicates, however, that Ettore admitted that she ran a printing and design company out of her home for a period of time during 1989; nothing in the record indicates that Councilwoman Ettore is presently doing so, or that she was doing so at the time of trial.

In *Township of Blackman v. Koller*, 357 Mich. 186, 98 N.W.2d 538, 540 (1959), the Michigan Supreme Court held that the enforcement of an ordinance against the defendants, while an identical nonconforming use of other property in the immediate zoned area had been permitted and continued to be permitted, constituted an unequal and unlawfully discriminatory application of the ordinance. While in Michigan, "a municipality cannot be estopped from enforcing a zoning ordinance because of the unauthorized action of its agents and administrative employees in granting permissive authority contrary to the terms of the ordinance," *id.* (citing *Fass v. City of Highland Park*, 326 Mich. 19, 39

N.W.2d 336 (1949)), the *Koller* decision was founded not upon estoppel principles, but upon principles of equal protection. The District Court did not address whether the City's enforcement of the non-profit requirement against Smith & Lee, while permitting other for-profit businesses to operate in the same single-family block, is an unequal and unconstitutional application of its zoning ordinance. Whether Smith & Lee is entitled to relief on this claim will have to be decided on remand. The court must determine whether Smith & Lee is similarly situated to MTM or to Cargill's. Additionally, the knowledge that the City had concerning out-of-home businesses operating near Mortenview Manor at the time it denied Smith & Lee's petition to rezone is not adequately developed in the District Court's findings.

### 4. History of Discrimination

■ The District Court admitted and relied on evidence of past actions by the City in finding it discriminated against the handicapped. In 1980, before the AFCFLA went into effect, the City prevented an AFC home for six residents from opening in Taylor. After passage of the AFCFLA, which requires municipalities to treat AFC homes with six or fewer residents as families, Taylor filed a declaratory judgment action seeking to, *inter alia*, declare the Act unconstitutional under the Michigan Constitution.[9]

The City argues that it was error for the court to have admitted this evidence because "what happened twelve years ago is irrelevant." It also asserts that the only historical evidence of discrimination that is relevant is the historical background of the decision at issue.

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d

8. As will be more fully developed below, the City did not have the option of simply issuing a letter of permission.

9. The record appears to indicate that only one member of the City Council that handled Smith & Lee's request had been a member of the Council that authorized pursuit of the declaratory judgment suit.

450 (1977) (proof of equal protection violation). "The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." *Id.* at 267, 97 S.Ct. at 564 (citations omitted). We do not interpret *Arlington Heights* as limiting the admission of historical evidence to the historical background of the action at issue. In *Keyes v. School District No. 1,* 413 U.S. 189, 207, 93 S.Ct. 2686, 2697, 37 L.Ed.2d 548 (1973), which was cited with approval in *Arlington Heights,* the Supreme Court found prior intentional discrimination of the school board against members of plaintiff's class highly relevant to the issue of the board's intent with respect to action taken against plaintiff. *See also City of Parma,* 661 F.2d at 566, 574.

The decision to admit or exclude evidence is within the sound discretion of the trial court and will be reversed on appeal only for a clear abuse of that discretion. *United States v. Phillips,* 888 F.2d 38, 40 (6th Cir. 1989). "Abuse of discretion exists where the reviewing court is firmly convinced that a mistake has been made." *Id.* Although the evidence was somewhat remote, we hold that the District Court did not abuse its discretion by admitting evidence of the City's past objections to handicapped group homes.

■ We do believe, however, that the court improperly excluded evidence that, in 1984, the City had rezoned what is known as the "Beechwood" property from single-family to multiple-family so that the owner could open a twelve-resident AFC home. This evidence was relevant to rebutting the historical evidence that the City has a history of discriminating against the handicapped. The United States argues that the testimony and exhibits the City sought to introduce were cumulative and redundant. Although the United States contends that "[o]ther evidence admitted by the district court already established the very facts that the City was apparently trying to prove about the Beechwood home," the refusal to admit and consider this evidence for the purpose requested was error.

### 5. Testimony of City Officials

■ The District Court relied on the testimony of several City Council members as further evidence of intentional discrimination. The Chairman testified that he opposed the twelve-person facility in part because he feared for the safety of the residents in case of a fire. The United States argues that the FHAA was meant to eradicate this paternalistic attitude that is the product of false or over-protective assumptions about the needs of handicapped people. Arguably, discrimination often takes the form of special rules that are allegedly designed to benefit handicapped persons. *See, e.g., Marbrunak,* 974 F.2d at 47. This, however, was the position of only one member of the Council.

All City Council members testified that the reasons they did not vote to rezone were "parking was a problem, that the police and fire were problems, that the whole issue is zoning, and that they certainly do not want to discriminate against the handicapped." All mentioned spot zoning. The fact that all City Council members testified to the same reasons for denying Smith & Lee's petition destroyed their credibility in the eyes of the court. The court thought it significant that Taylor had never commissioned any studies to inquire about the impact of parking, traffic, police or fire if the home had twelve residents. It believed that the Council members had agreed to testify to the same things and that the reasons given were pretextual. The reasons that were given by the Council members, however, are the reasons most zoning laws are enacted and the reasons upheld by courts in Fifth Amendment taking challenges to zoning laws. We see no basis for finding, as did the District Court, that the reasons for enforcing the ordinance were incredible because all of the Council members defended its enforcement on the same grounds. The District Court seems to have rejected the validity of their concern for parking on the ground that parking by a large family could be as great or greater than the parking of visitors to this twelve-person home. That is, of course, possible.

But with an average family size in Taylor of three persons per household, parking for this rezoned home would be in excess of the average and would be a proper factor to consider in any rezoning, including an accommodation for the handicapped.

### B. Reasonable Accommodation

The District Court also held that Taylor had violated the FHAA by failing to "make reasonable accommodations in [its] policies, practices, or services ... necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). The court, citing *Nathanson v. Medical College of Pa.*, 926 F.2d 1368, 1384–85 (3d Cir.1991) (analogous section 504 of the Rehabilitation Act requires affirmative steps to accommodate the handicapped), concluded that this provision imposes affirmative obligations on the City to accommodate the needs of persons with disabilities. The court appears to have concluded that the Council could have merely sent a letter of permission to the DSS authorizing up to twelve residents in the home without rezoning, and that the refusal to do so was an unreasonable failure to accommodate.

The AFCFLA provides that:

A temporary license shall not be granted under this act if the proposed adult foster care facility for more than 6 adults has not obtained zoning approval or obtained a special or conditional use permit if required by an ordinance of the city, village, or township in which the proposed facility is located.

MICH.COMP.LAWS § 400.716(2). Marjorie Murrell is a Michigan DSS official who is responsible for issuing licenses under the AFCFLA. Murrell determines whether an applicant has received the local approval necessary for AFC homes that care for more than six residents under this section. Murrell testified that in absence of a special or conditional use permit requirement, zoning approval can be expressed in any way, rezon-

ing is not required. "Over the years we have accepted letters from communities, we have accepted occupancy permits, we have accepted minutes from Council meetings where the Council has given approval, whatever shows they have no objection to the home [with more than six residents] being there."

The District Court found that:

There is no indication on the record that a reasonable accommodation would cause the City or the Mortenview neighborhood any burden. Taylor could have easily issued a letter of permission as suggested by Ms. Murrell of DSS and as presented by Linda Lee to the City Council at its Study Session of March 19, 1990. The Court therefore finds Taylor in violation of 42 U.S.C. § 3604(f)(3)(B) because it could have reasonably accommodated Mortenview Manor housing twelve residents.

■ The City argues that a letter of permission would be "utterly inconsistent with the zoning approval process." The Council believed that the only way it could grant Smith & Lee's proposal is to spot zone. In addition to being generally disfavored, spot zoning is inconsistent with the City's Master Land Use Plan. The United States responds by asserting that "a defendant cannot justify its failure to make an otherwise reasonable accommodation simply because it would require some variation from normal procedures. The whole point of the reasonable accommodation provision is to require a change in standard procedures where it would not impose an undue burden on the defendant." Without citing any authority other than the testimony of Murrell, plaintiffs argue that the case does not revolve around the issue of spot zoning, because the City had the letter option and did not have to formally rezone. We agree with the City that the Council has no authority under the City or Village Zoning Enabling Act[10] or under its zoning ordinance to authorize an inconsistent use in a R–1A district by simply issuing a letter of permission. The Council,

---

**10.** "In Michigan, local units of government have no inherent authority to engage in zoning—the state must specifically grant them authority." JOHN G. CAMERON, JR., MICHIGAN REAL PROPERTY LAW— PRINCIPLES AND COMMENTARY, § 23.03 at 920 (1985).

The statutory authority is found in the City or Village Zoning Enabling Act, MICH.COMP.LAWS § 125.581 *et seq.*, and the County Rural Zoning Enabling Act, MICH.COMP.LAWS § 125.201 *et seq.*

an elected body, was required to act in accordance with its required procedures. The fact that the state was willing to accept a letter whether or not the Council had authority to give one does not enlarge the Council's authority. The appropriate inquiry on accommodation thus was not whether the City should give a letter to the state, but rather, whether refusal to rezone constitutes a violation of the FHAA's reasonable accommodation provision.

Cases interpreting the reasonable accommodation provision of the FHAA as it relates to local zoning laws are of two types. Those of the first type deal with zoning restrictions that single out group homes for the handicapped for regulation, *i.e.*, facially discriminatory ordinances, *see, e.g., Marbrunak*, 974 F.2d at 43 (zoning ordinance that imposed burdensome safety requirements on homes housing people with disabilities violates FHAA); *Horizon House Developmental Servs., Inc. v. Township of Upper Southampton*, 804 F.Supp. 683 (E.D.Pa.1992); *The Devereux Foundation, Inc. v. O'Donnell*, 1990 WL 132406, 1990 U.S.Dist. LEXIS 11331 (E.D.Pa.1990). This is not such a case as the ordinance is facially neutral.

Those of the second type deal with situations where the application of a neutral rule barred group homes of handicapped people from operating in certain areas. *See Oxford House, Inc. v. Township of Cherry Hill*, 799 F.Supp. 450 (D.N.J.1992) (local definition of family); *Village of Marshall*, 787 F.Supp. 872 (state statute requiring group homes to be no less than 2,500 feet apart). The municipalities in both *Cherry Hill* and *Marshall* were vested with legislative authority to grant exceptions to the neutral requirements impeding the operating of the group homes. The issue in these cases was whether the municipalities failed to make reasonable accommodations by refusing to grant the exception.

In *Cherry Hill*, the court examined the legislative history of the FHAA and concluded that Congress intended that cases inter-

preting the reasonable accommodation requirement of the Rehabilitation Act, particularly *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), serve as the governing standard of reasonable accommodation under the FHAA. *Cherry Hill*, 799 F.Supp at 461 (citing H.R.Rep. No. 711, 100th Cong., 2d Sess. 25 (1988), *reprinted in*, 1988 U.S.Code Cong. & Admin.News 2173, 2186). In *Davis*, the Supreme Court held that an accommodation is reasonable if it neither requires a "fundamental alteration in the nature of a program," nor imposes "undue financial and administrative burdens." 442 U.S. at 410, 412, 99 S.Ct. at 2369, 2370. Similarly, the *Marshall* court found that "a 'reasonable accommodation' is one [that] would not impose an undue hardship or burden upon the entity making the accommodation, *Majors v. Housing Authority of DeKalb*, 652 F.2d 454, 457 (5th Cir.1981), and would not undermine the basic purpose [that] the requirement seeks to achieve. *Doherty v. Southern College of Optometry*, 862 F.2d 570, 575 (6th Cir.1988) [, *cert. denied*, 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989) ]." *Marshall*, 787 F.Supp. at 878. Both courts concluded that granting the exception would impose no undue hardship upon the municipality and, therefore, by refusing to grant it, the municipality failed to make a reasonable accommodation.

■ The present case is distinguishable on the grounds that there is no provision authorizing Taylor to grant variances in R–1A zones. We must decide whether in absence of a variance procedure a city must rezone or amend its laws to accommodate handicapped persons under the FHAA and the circumstances here. In no cases have the courts required a city to rezone or to amend its zoning ordinance to comply with the FHAA.[11]

Plaintiffs contend that even if spot zoning is required to grant Smith & Lee's proposal, such rezoning would be a reasonable accommodation. The Michigan Supreme Court de-

11. We have found one case addressing the issue of whether reasonable accommodation includes the obligation to rezone. In *Moyer v. Lower Oxford Township*, 1993 WL 5489 (E.D.Pa.1993), the District Court denied the Township's motion to dismiss plaintiff's reasonable accommodation

claim under section 3604(f)(3)(B). The court found that "[p]laintiff may be able to show that the Township did not make reasonable accommodations when it *refused to amend the zoning ordinance* or issue a variance." However, the merits of the case have yet to be addressed.

fines spot zoning as "a small zone of inconsistent use within a larger zone." *Penning v. Owens,* 340 Mich. 355, 65 N.W.2d 831, 836 (1954). Spot zoning is "closely scrutinized by a court and sustained only when the facts and circumstances indicate a valid exercise of the zoning power." *Id.* The District Court did not address the issue of whether a City should be required to spot zone under the FHAA's reasonable accommodation provision because its decision was based on the letter-of-permission proposal.

If spot zoning is rejected as unreasonable, the only other accommodation that is available is an amendment to the zoning ordinance to remove the profit-making restriction with respect to group homes for the handicapped. The City acknowledges that if the for-profit requirement is eliminated, the group home here meets the City's definition of a family. We raise the option of amending the ordinance as an alternative to spot zoning because for practical purposes, either method of accommodation would achieve the same result: an unlimited number of commercial AFC homes for more than six residents in R–1A districts. For if the City is required to spot zone in this case, it would have no choice but to grant further rezoning requests under similar circumstances.

The non-profit element in the City's definition of family is included in its zoning scheme for legitimate and non-discriminatory reasons. The City seeks to exclude rooming houses and other dwellings from its R–1A districts to preserve the single-family residential character of its neighborhoods. We likewise view concerns related to such residences locating in family neighborhoods such as increased traffic and noise as reasonable and legitimate. To force the City to allow rooming houses and other commercial residences in its R–1A districts would undermine the basic purpose of its non-profit requirement.

However, we recognize that the handicapped may have little choice but to live in a commercial home if they desire to live in a residential neighborhood. To provide the handicapped with equal housing opportunities, the City must make the necessary "reasonable accommodations." The question

then becomes whether the proposed accommodation is reasonable.

We balance the City's interests against the need for an accommodation in this case. The premises can be used to house a handicapped group if there are six or fewer occupants and indeed is being used in that way. This case is thus distinguishable from a case in which a neutral zoning law operates to keep the handicapped out of residential districts entirely. *See, e.g., Oxford House, Inc. v. Town of Babylon,* 819 F.Supp. 1179 (E.D.N.Y.1993). The state statute defining family to include group homes of six or less is, as we have noted, itself an accommodation.

The need for a further accommodation by increasing the number of occupants to twelve is Smith & Lee's need, which is unable to make a reasonable profit in this home with only six occupants. This need does not appear to exist for other operators of group homes. There are several AFC homes for the handicapped with six or fewer residents operating in R–1A districts throughout Taylor. The record reflects eleven; the United States' brief states that there are eighteen. It does not appear whether these other six-person AFC homes are run by for-profit organizations and if so, whether they are able to make a reasonable profit with six residents. If they are, the accommodation requested would appear to be an accommodation primarily for Smith & Lee rather than for the handicapped.

Before deciding whether Taylor must accommodate the handicapped by permitting twelve-person homes, the court must first know if that accommodation is needed to supply a reasonable number of such homes. If the District Court finds that the other six-person homes are non-profit, or that they are able to operate profitably because the homes were rented or purchased at lower costs not now available, then permitting for-profit businesses to supply family housing for the handicapped may be a reasonable accommodation. However, the inquiry should not be whether a particular profit-making company needs such an accommodation but, rather, do such businesses as a whole need this accommodation. Otherwise, by unreasonably inflating costs, one business would get such an

accommodation while another, better run, did not. Also, in considering the effect of an accommodation, the court must consider not just the effect of a single home, but it needs to know the effect on other potential applications. Here there are many other homes in the City that, in view of the large profit to be made by expanding to twelve residents, might well seek similar action in addition to other potential applicants. This information is also necessary to decide whether an accommodation increasing the size to more than six but less than twelve residents might be appropriate.

The court here found that Smith & Lee, although it made a small profit, had not paid the principals for their services. The costs submitted, however, included the cost of remodeling the building for twelve residents. One of the problems in basing an accommodation on the need for profits is to fix a reasonable profit. In deciding whether this is a reasonable accommodation, the court must consider the burden of thrusting cities and courts into that kind of determination.

### III. Civil Penalty

■ The City challenges the District Court's assessment of the civil penalty under 42 U.S.C. § 3614(d)(1)(C)(i), which provides that the court "may, to vindicate the public interest, assess a civil penalty against the respondent—in an amount not exceeding $50,000, for a first violation." The court gives no reasons as to why it imposed the maximum penalty of $50,000. However, the statute gives complete discretion to the court "to vindicate the public interest," by using the word "may." *Cf. Curry v. Contract Fabricators, Inc. Profit Sharing Plan*, 891 F.2d 842, 848 (11th Cir.1990) (applying abuse of discretion standard in reviewing civil penalty); *Federal Election Comm'n v. Furgatch*, 869 F.2d 1256, 1258 (9th Cir.1989) (same).

As there is scant case law reviewing civil penalties assessed under this statute, both parties cite the legislative history of the Act for factors that courts should consider in determining the appropriate amount of the penalty.

As with civil penalties provided under Sec. 812(g), these are maximum, not minimum, penalties, and are not automatic in every case. When determining the amount of a penalty against the Defendant, the Court should consider the nature and circumstances of the violation, the degree of culpability, any history of past violations, the financial circumstances of that Defendant and the goal of deterrence, and other matters that justice may require.

H.R. No. 711, 100th Cong., 2d Sess. 40, *reprinted in*, 1988 U.S.Code Cong. & Admin.News 2201.

Predictably, the government argues that by applying these factors, the evidence strongly supports the award of $50,000. The City, on the other hand, argues that no justification exists for the imposition of any penalty. In view of our disposition of the issues raised in this appeal, we see no basis for a penalty. The law as to what accommodation is required is too uncertain to penalize the City's conduct.

In *United States v. Borough of Audubon, N.J.*, 797 F.Supp. 353 (D.N.J.1991), the district court held that Audubon had discriminated against a home of recovering alcoholics and drug abusers in violation of the FHAA by overzealously enforcing its zoning ordinance. Audubon had a history of a general lack of enforcement, yet it made the home's zoning violations its top priority with everything else "pretty much taking a back seat." The actions of Audubon were abundantly more invidious than the actions of Taylor in the present case. The *Audubon* court, however, did not impose the maximum civil penalty as did the court in the present case.

We shall also award a civil penalty under [section 3614(d)(1) ](C), in the amount of $10,000. We have found that Audubon officials acted with an intent to discriminate on the basis of a handicap, and we believe that this penalty is necessary to serve the purposes of both retribution and deterrence. The United States has sought a much more severe monetary penalty. However, there is no evidence in the record that Audubon has engaged in discriminatory conduct outside the context of this case; and, without such evidence, we are willing to view this case as an aberration

which necessitates less than the maximum penalty allowed by law.

*Id.* at 363.

Unlike *Audubon,* in the present case there was evidence that the City had brought a declaratory judgment action 13 years before. On the other hand, there was evidence that the City had accommodated other AFC homes like Mortenview Manor. The District Court should have been required to articulate the reasons for imposing the maximum penalty allowed under the statute.

### IV.

Accordingly, we reverse the District Court's finding on intentional discrimination. In sum, we have concluded that the court erred in considering the following as evidence of intentional discrimination: 1) the officials' in-court interpretation of the single-family requirement; 2) the rezoning requirement; and 3) the consistent testimony of Taylor officials concerning the reasons they voted against rezoning. We remand this issue to the District Court, which will have to make its finding on this issue without reliance on these three factors. The court will have to determine whether the City's allegedly unequal application of the non-profit requirement and its alleged history of discrimination against the handicapped supports a finding of intentional discrimination in this case.

We reverse the District Court's holding that the City failed to make reasonable accommodations because it would not issue a letter of permission. We remand this issue for a determination of whether reasonable accommodation under the FHAA requires that Taylor spot zone or amend its neutral zoning ordinance to provide for AFC homes with more than six residents.

We reverse the District Court's imposition of the $50,000 penalty. If upon remand, the court finds that the City violated the Act and, in its discretion imposes a penalty, it must provide the reasons for deciding upon a particular amount.

CONTIE, Senior Circuit Judge, dissenting.

The district court determined that the City of Taylor ("City") had failed to make reasonable accommodations in its policies and procedures to afford equal housing opportunities to the handicapped in violation of 42 U.S.C. § 3604(f)(3)(B), and that the City had engaged in intentional discrimination on the basis of handicap in violation of 42 U.S.C. § 3604(f)(1). On appeal, the City must show that the district court's findings are clearly erroneous. *See Pullman–Standard v. Swint,* 456 U.S. 273, 290, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982) ("[A] court of appeals may only reverse a district court's finding on discriminatory intent if it concludes that the finding is clearly erroneous under Rule 52(a)."). *See also United States v. Taylor,* 956 F.2d 572, 576 (6th Cir.) (en banc) ("Findings of fact anchored in credibility assessments are generally not subject to reversal upon [appellate] review."), *cert. denied,* —— U.S. ——, 113 S.Ct. 404, 121 L.Ed.2d 330 (1992).

The record reveals that the City acted with discriminatory intent: two City Council members testified that the City permits 12 unrelated renters to live together as a "family" in an R–1A zone because the renters, unlike the handicapped persons, "will be capable of caring for themselves"; the City's Building Director testified that he initially refused to issue Smith & Lee's building permit because he feared mentally ill persons would reside in the facility; the City Council Chairman noted that he feared the "notoriety" of the adult foster care home would drive down property values; and, a Council member angrily accused Smith & Lee of ruining the neighborhood during a City Council meeting.

City officials also made a number of veiled discriminatory comments. The City Council Chairman testified that he opposed the 12–person adult foster care home because he feared for the safety of the handicapped residents that might find it more difficult to escape from a fire. Such concerns constitute overt discrimination disguised as a desire to protect handicapped persons. *See generally International Union, UAW v. Johnson Controls, Inc.,* 499 U.S. 187, 200, 111 S.Ct. 1196,

1204, 113 L.Ed.2d 158 (1991) ("The beneficence of an employer's purpose does not undermine the conclusion that an explicit gender-based policy is sex discrimination[.]"). Moreover, the City allows other businesses to operate from homes in the residential neighborhood (including welding and construction companies) that are far less compatible with the residential character of the area.

Furthermore, the City fails to substantiate its claim that the adult foster care facility would cause any of the harms (including parking shortages, traffic congestion, and difficulties with police and fire protection) that City officials cited to justify their opposition to the home. In fact, City officials admitted that the adult foster care residents would not threaten the community and acknowledged that none of the facility's neighbors complained about its presence. Though the City suggests that there are other adult foster care homes in the City where the handicapped could live, the Fair Housing Amendment Act provides that handicapped persons may "live in the residence of their choice." *Marbrunak, Inc. v. City of Stow,* 974 F.2d 43, 48 (6th Cir.1992).

Though the City asserts that the definition of "family" in its zoning ordinance exempts it from the Act pursuant to 42 U.S.C. § 3607(b)(1) ("Nothing in this subchapter limits the applicability of any reasonable local, State, or Federal restrictions regarding the maximum number of occupants permitted to occupy a dwelling."), the City's definition of family is not an occupancy restriction. In fact, the City admitted that it would permit 12 unrelated non-handicapped renters to live together in a single family neighborhood. Accordingly, the City's rejection of Smith & Lee's proposed facility cannot be attributed to any occupancy standard exempted by 42 U.S.C. § 3607(b)(1).

Because the record clearly supports the district court's determinations, I would affirm.