UNITED STATES of America, Plaintiff,

v.

**CITY OF TAYLOR, MICHIGAN,**
**Defendant.**

**SMITH & LEE ASSOCIATES,**
**INC., Plaintiff,**

v.

**CITY OF TAYLOR, MICHIGAN,**
**Defendant.**

Nos. 91–CV–73218–DT, 91–CV–72280–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 5, 1995.

Gregory J. Bator, Birmingham, MI, for plaintiff Smith & Lee Associates, Inc.

Saul A. Green, L. Michael Wicks, U.S. Atty., Detroit, MI, Joseph D. Rich, Barbara A. Burr, Sharon Bradford Franklin, U.S. Dept. of Justice, Civ. Rights Div., Housing & Civ. Enforcement Section, Washington, DC, for plaintiff U.S.

Patrick B. McCauley, Alan B. Koenig, Sommers, Schwartz, Silver & Schwartz, Southfield, MI, for defendant.

## OPINION

GILMORE, District Judge.

This case is before the Court upon remand from the United States Court of Appeals for the Sixth Circuit. On July 14, 1992, this Court entered its opinion in *United States v. City of Taylor, Michigan,* 798 F.Supp. 442 (E.D.Mich.1992), granting relief to the Plaintiffs and ordering payment of damages and civil penalties. The case was reversed by the United States Court of Appeals for the Sixth Circuit in *Smith & Lee Associates v. City of Taylor, Michigan,* 13 F.3d 920 (6th Cir.1993). The matter was remanded to the Court for further consideration.

The issues before the Court are whether the City of Taylor intentionally discriminated, in violation of the *Fair Housing Act,* 42 U.S.C. § 3601, et seq., in refusing to allow a twelve-person adult foster care home to locate in a single-family residential district, and whether the City made reasonable accommodations for adult foster care homes in Taylor. For the reasons set forth below, the Court holds that the City did violate the *Fair Housing Act,* and failed to make reasonable accommodations for adult foster care homes in Taylor. An injunction will issue against the City directing the amendment of its ordinances, damages will be awarded to Plaintiffs Smith & Lee, and a civil penalty will be imposed pursuant to 42 U.S.C. § 3614(d)(1)(C)(i).

## I. BACKGROUND

### A.

Smith & Lee Associates ("Smith & Lee") is a for-profit Michigan corporation that owns and operates Adult Foster Care ("AFC") homes in the State of Michigan. Smith & Lee was organized for the purpose of purchasing the residential home involved in the instant case, Mortenview Manor in Taylor, Michigan, and using that home as an AFC caring for twelve elderly disabled persons. Smith & Lee's officers, who are each 25% shareholders, are Marlene Smith, President; Paul Lee, Vice President; Cullin Smith, Treasurer; and Linda Lee, Secretary. Mortenview Manor, located at 8734 Mortenview Drive in Taylor, is a one-story dwelling and includes a kitchen, living room, dining room, six bedrooms, two full baths, and a small office. AFC homes like Mortenview Manor are a form of alternative housing designed to provide housing and care for handicapped persons who can no longer live independently, but do not require the 24-hour medical care provided in institutional settings such as nursing homes.

Not all AFC homes house residents with the same disabilities or needs. For example, some AFC homes care for developmentally disabled persons, and others house residents suffering from traumatic brain injuries. Mortenview Manor specializes in caring for members of the elderly disabled population, and currently houses six elderly disabled residents who suffer from Alzheimer's disease and other forms of dementia, organic brain syndrome, and other ailments associated with growing old. Many AFC homes, known as "contract" homes, receive subsidies from state or community social service agencies. However, AFC homes for the elderly disabled population are not eligible for such "contracts." Hence, "non-contract" homes like Mortenview Manor must rely exclusively on payments from their residents to operate.

AFC homes differ from nursing homes in both purpose and function. According to the State Department of Social Services ("DSS"), the goal of AFC homes is to integrate disabled residents into the surrounding community and provide them with the care they need in a home-like setting. Private homes in residential neighborhoods are the preferred sites for AFC homes because they help to shield residents from the social stigma that so commonly surrounds nursing homes and other forms of institutional housing for elderly or disabled persons. Unlike nursing homes, which are based on a "medical model" in which patients are dependent upon medical personnel and staff to service all of their daily needs, AFC homes mirror traditional family settings. For example, Smith & Lee's residents eat their meals together, socialize, play cards, watch television and care for each other like members of a traditional family. The limited size of AFC homes [1] promotes development of family-like relationships between the staff and the residents. It is also common for family-like relationships to develop between the residents and the family members of other residents who visit the home. Finally, because AFC residents are not bed-ridden and do not require constant medical attention, AFC homes provide a more appropriate level of care than nursing homes. By providing disabled individuals the care they need in the least restrictive form of environment possible, AFC housing encourages residents to maintain their independence and functional capacity to the greatest possible extent. In addition to being the most appropriate setting for many disabled individuals, AFC homes are often the only means by which disabled adults are able to live in single-family type homes in residential communities.

Regarding the elderly disabled population residing at Mortenview Manor, extensive trial testimony revealed that the small, family-like atmosphere created in an AFC home located in a single family neighborhood was not merely desirable, but medically beneficial to elderly adults suffering from various forms of dementia, such as Alzheimer's Disease. Dr. Robert Bernstein, a recognized expert in mental health and the residential

---

**1.** In Michigan, the Department of Social Services licenses AFC homes in three sizes: small group homes for 1–6 residents, mid-sized homes for 7– 12 residents, and the largest homes for 13–20 residents. The majority of AFC homes in Michigan are mid-sized, housing 7–12 residents.

needs of elderly adults with dementia, testified that AFC homes for fifteen or fewer residents provide a homelike setting that incorporates familiar environmental cues relating to orientation and daily living tasks. Because of this "environmental cuing," living in an AFC home, as opposed to a nursing home or other institutional housing, actually lessens the risk of functional decline for adults with dementia. Moreover, the quiet setting and familiar sights and sounds of a residential home with a backyard, a garden, and children playing nearby can help adults with Alzheimer's and other forms of dementia to avoid disabling confusion and to participate in community life.

### B.

Mortenview Manor is a clean, comfortable, AFC home highly praised by its residents and their family members. It is located in a quiet, single-family residential neighborhood in Taylor, and is surrounded by lawns, trees and other single-family homes. This area is designated as "R–1A" under the Taylor zoning ordinance. Mortenview Manor is presently permitted to exist there only because of a State law intended to accommodate the handicapped which mandates that AFC homes for six or fewer residents be permitted in all residential neighborhoods including areas zoned for single family use. That state law provides:

> In order to implement the policy of this state that persons in need of community residential care shall not be excluded by zoning from the benefits of normal residential surroundings, a state licensed residential facility providing supervision or care, or both, to 6 or less persons shall be considered a residential use of property for the purposes of zoning and a permitted use in all residential zones, including those zoned for single family dwellings, and shall not be subject to a special use or conditional use permit or procedure different from those required for other dwellings of similar density in the same zone.

MICH.COMP.LAWS § 125.583b(2). The Michigan Adult Foster Care Facility Licensing Act ("AFCFLA") requires new AFC homes accommodating more than six residents to re-

ceive municipal approval before the state will issue an AFC license. MICH.COMP.LAWS § 400.716(2).

From the start, Smith & Lee sought to house twelve residents in Mortenview Manor. After purchasing the house, Smith & Lee began renovations to meet state standards for mid-sized AFC homes, but in September of 1989, the City of Taylor refused to issue a building permit for these renovations, asserting that a twelve-person AFC home could not operate in a R–1A zone. Eventually, a permit was issued, the renovations were completed, and following numerous inspections, Smith & Lee was informed by the DSS that Mortenview Manor could operate with twelve residents as soon as the City gave its permission. If Smith & Lee had been permitted to provide housing for an additional six residents at that time, the house would have remained the same size and the household would have continued to operate on the same family-like model.

However, Taylor refused to give Smith & Lee permission to operate, claiming that the City zoning ordinance prohibited mid-sized AFC homes from existing in single-family zones. Although the Taylor zoning ordinance does not specifically address AFC homes, Michael Manore, Director of the Office of Development Services at that time, informed Smith & Lee that an AFC home for twelve residents was considered a multiple-family use and could not exist at Mortenview Manor unless the City rezoned the property to multiple-family zoning, "RM–1." Neither Mr. Manore nor any Taylor City official conducted studies or made formal inquiries into the purpose or functioning of AFC homes before characterizing mid-sized AFC homes as multiple-family uses.

After being informed by the City of Taylor that a rezoning to RM–1 was necessary to operate with 7–12 residents, Smith & Lee began operating the home for six residents, accepting their first resident in December of 1989. In January of 1990, they petitioned the City to rezone the home to a RM–1 district. Taylor officials referred the petition to the City's private planning consultant, Wade/Trim Impact, which recommended that the request be denied because RM–1 zoning

would be inconsistent with the established zoning of the neighborhood based on the recommendation of the City's Master Land Use Plan 2000 ("Master Plan"). In making this recommendation, Wade/Trim consultants accepted at face value Taylor's characterization of an AFC home for 7–12 residents as a "multiple-family use" belonging in an RM–1 zone. Wade/Trim was never asked to consider whether an AFC home with twelve elderly disabled residents would, in fact, more closely resemble a multiple-family use than a single-family use.

A public hearing before the Taylor Planning Commission was held on February 21, 1990. Although no objections were made by neighbors of the Mortenview Manor home, the Commission voted to recommend to the City Council that the petition be denied. At a March 5, 1990 study session, the City Council discussed Smith & Lee's rezoning request and at its March 6, 1990 meeting, the Council denied the request, citing concerns over spot zoning and inconsistencies with the City's master development plan. No alternative proposals were considered at that time.

## C.

On May 10, 1991, Smith & Lee instituted this action against the City alleging violations of the FHAA, 42 U.S.C. §§ 3604(f)(1)(B), 3604(f)(3)(B). The United States instituted a similar action shortly thereafter and this Court consolidated the two cases. After a bench trial, the Court issued its opinion on July 15, 1992, finding discrimination by the City in violation of sections 3604(f)(1)(B) and 3604(f)(3)(B). Rather than require Taylor to "spot zone" Smith & Lee's property, the Court ordered the City to send a letter to the DSS giving Smith & Lee permission to operate the AFC home for twelve residents, and permanently enjoined the City from interfering with the operation of the home. The Court also ordered the City to pay damages in the amount of one-hundred and fifty-two thousand dollars ($152,000) to Smith & Lee (its profits if it had been permitted to operate with twelve residents instead of six, plus some expenses incurred), and imposed a civil penalty of fifty thousand dollars ($50,000) under 42 U.S.C. § 3614(d)(1)(C)(i). The City

filed a timely appeal. On August 14, 1992, a panel of the Sixth Circuit Court of Appeals issued a stay of the injunctive relief and of the execution of the monetary relief without bond pending appeal.

On appeal, the Sixth Circuit reversed this Court's finding of intentional discrimination by the City of Taylor in violation of 42 U.S.C. §§ 3604(f)(1)(B) and 3604(f)(3)(B). *Smith & Lee Assoc., Inc. v. City of Taylor,* 13 F.3d 920 (6th Cir.1993). The Sixth Circuit remanded the case and stated that this Court "will have to determine whether the City's allegedly unequal application of the non-profit requirement and its alleged history of discrimination against the handicapped supports a finding of intentional discrimination in this case." 13 F.3d at 927–928, 933.

Regarding evidence of historical discrimination by the City of Taylor against the handicapped, the Sixth Circuit instructed this Court to consider, as possible rebuttal evidence, that the City had rezoned other property from single-family to multiple-family so that the owner could operate a twelve-person AFC home for elderly disabled persons. The Sixth Circuit also reversed this Court's finding that the City of Taylor intentionally discriminated by allowing certain "for-profit" business other than Smith & Lee's AFC home to operate in single family residential areas and remanded the issue so that this Court could determine whether Mortenview Manor was similarly situated to these businesses and whether Taylor had applied its zoning ordinance in an unequal and unconstitutional manner.

On the question of Taylor's duty to accommodate handicapped persons under the FHAA, the Sixth Circuit reversed this Court's finding that the City failed to make a reasonable accommodation under the FHAA in violation of 42 U.S.C. § 3604(f)(3)(B) by refusing to issue a letter of permission to the DSS allowing Smith & Lee to house twelve residents. The substance of this reversal was the Sixth Circuit's determination that the City had no authority under the City or Village Zoning Enabling Act, MICH.COMP. LAWS § 125.201 *et seq.,* or under its own zoning ordinance to issue such a letter of permission. The reasonable accommodation

issue was remanded to this Court to determine whether the FHAA and the facts and circumstances of this case required that the City "spot zone" Smith & Lee's property, or, in the alternative, amend its neutral zoning ordinance to allow "for-profit" AFC homes of more than six residents in single-family neighborhoods.

Finally, the Sixth Circuit reversed this Court's imposition of the maximum $50,000 penalty under 42 U.S.C. § 3614(d)(1)(C)(i), holding that "the law as to what accommodation is required is too uncertain to penalize the City's conduct," and requiring that reasons justifying the imposition of a penalty be provided by the Court, should it conclude upon remand that a penalty is appropriate.

After conducting an extensive trial on remand in which substantial new evidence was presented by all parties, this Court once again concludes that the City of Taylor has violated the FHAA, both in discriminating against present and proposed members of Mortenview Manor based on handicap, in violation of 42 U.S.C. § 3604(f)(1)(B), and in refusing to make a reasonable accommodation in violation of 42 U.S.C. § 3604(f)(3)(B).

## II.

### A. Intentional Discrimination

The intentional discrimination provision of the Fair Housing Act, located in section 3604(f)(1), makes it unlawful:

> (1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—
>
> (A) that buyer or renter,
>
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or make available; or
>
> (C) any person associated with that buyer or renter.

To prove that Taylor engaged in intentional discrimination in violation of this provision, plaintiffs need only show that discriminatory animus was a "motivating factor" for Taylor's action. "There is no requirement that such intent be the sole basis of official action." *United States v. City of Parma*, 661 F.2d

562, 575 (6th Cir.1981), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982). The assessment of whether actions have been taken with discriminatory intent "demands a sensitive inquiry into such circumstantial and direct evidence ... as may be available." *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). This approach is critical in cases involving the actions of public officials, because "[m]unicipal officials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against [a protected class]." *United States v. City of Birmingham, Mich.*, 727 F.2d 560, 565 (6th Cir.1984), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984) (quoting *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064–65 (4th Cir.1982)).

In this case, evidence of Taylor's intentional discrimination against the handicapped is found in: (1) The City's unsupported characterization of a mid-sized AFC home as a "multiple-family" use; (2) The City's disparate application of its zoning ordinance among AFC homes and other homes; (3) Paternalistic and other discriminatory statements made by Taylor officials about Mortenview Manor's elderly disabled residents; and (4) Evidence of historical discrimination against the handicapped which was not substantially rebutted by the City's decision to rezone another twelve-resident AFC home from single-family to multiple-family zoning.

### 1. Characterization of Proposed AFC Home as a "Multiple-family" Use

█ The legal justification offered by the City of Taylor in refusing to allow Smith & Lee to house twelve residents at Mortenview Manor was an alleged conflict with the City's zoning ordinance. Although the Taylor ordinance did not (and still does not) actually address zoning for AFC homes of any size, the City chose to characterize a twelve-person AFC home as a multiple-family use, thereby requiring that Mortenview Manor be rezoned to "RM–1" before Smith & Lee would be allowed to house twelve elderly disabled residents there. Having declared that RM–1 zoning was necessary under the

ordinance, the City proceeded to reject Smith & Lee's petition for rezoning, offering two justifications: (1) that State law did not require the City to characterize AFC homes for more than six residents as single family uses, *see* MICH.COMP.LAWS § 125.583b(2); and (2) that a twelve-person AFC home did not meet the definition of "family" under the City zoning ordinance, which currently reads as follows:

a. [A]n individual or group of two or more persons related by blood, marriage or adoption, together with foster children and servants of the principal occupants, with not more than one (1) additional unrelated person who are domiciled together as a single, domestic, housekeeping unit in a dwelling unit, or

b. A collective member [sic] of individuals domiciled together in one (1) dwelling unit whose relationship is of a continuing nontransient domestic character and who are cooking and living as a single nonprofit housekeeping unit. This definition shall not include any society, club, fraternity, sorority, association, lodge, coterie, [or] organization....

CITY OF TAYLOR ZONING ORDINANCE, § 2.02(36). Because Mortenview Manor is owned by Smith & Lee, and not by the residents, it is technically a "for-profit" housekeeping unit. Therefore, Mortenview Manor's residents are not a family under section 2.02(36) of Taylor's ordinance.

In analyzing the City of Taylor's application of its zoning ordinance to AFC homes, the court recognizes the wide-ranging discretion a local municipality has in regulating land use within its borders. *See Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926). The Court does not dispute the Sixth Circuit's finding that Taylor's definition of a "family" is a constitutional exercise of its legislative discretion to zone a residential neighborhood, and accepts that the non-profit element in the City's definition of family is included in its zoning scheme for legitimate and non-discriminatory reasons. Nevertheless, the Court holds that the City of Taylor's refusal to allow Smith & Lee to operate a 7–12 person AFC home within a single-family neighborhood was not the result of a neutral application of the City's zoning ordinance. The Court concludes that the characterization of Smith & Lee's proposed home as a "multiple-family" use was not required to preserve the stated goals and purposes of the zoning ordinance, and was motivated by a discriminatory animus against handicapped persons.

There is no question that segregation of commercial enterprises from residential housing is desirable for a municipality and its residents. It is also clear that a city's zoning powers entitle it to implement segregation of this nature, within the confines of federal statutes such as the Fair Housing Act, which prohibits certain forms of segregation in housing. The City of Taylor has attempted to exercise this power by establishing single-family zoned areas in the City, and defining the families permitted to live in them under section 2.02(36) of its ordinance. However, the absence of any mention of AFC homes in Taylor's ordinance makes it clear that the City did not consider these homes in drafting section 2.02(36) of the ordinance.

Despite the confines of the statutory language, there is no question that the fundamental purpose of any AFC home, including Mortenview Manor, is to provide a home in a family-like setting for handicapped individuals. In addressing this issue, the Sixth Circuit deemed the use of Mortenview Manor by its residents insignificant, holding that a proper application of the ordinance required the Court to look to the use of the home by Smith & Lee, "which owns the home, [and] has not transferred any property interest to its residents and holds the possessory interest in the property." The Sixth Circuit went on to conclude that Mortenview Manor, although provided for the handicapped, "is indistinguishable from a rooming house," which it defined as a profit-making enterprise furnishing meals and rooms for compensation.

Having had the opportunity to learn more about the purpose and structure of AFC homes in general and Mortenview Manor in particular, it is clear to the Court that the Sixth Circuit was not fully informed when it declared Mortenview Manor to be indistinguishable from a rooming house in which

transient residents hold no possessory interest in their place of residence. Through the course of trial, the one-year Resident Care Agreement signed by each new resident accepted at Mortenview Manor was identified and explained to the Court. Plaintiffs demonstrated that through this Agreement, Mortenview Manor's residents **do** gain a possessory interest in the home, similar to that of any other long-term renter. For example, payment of rent to Smith & Lee under the Agreement entitles Mortenview Manor's residents to the Michigan Homestead tax exemption for renters. Moreover, Smith & Lee's President, Marlene Smith testified that Smith & Lee considers its relationship with its residents to be a long-term arrangement, and expects that residents will continue to renew their agreements annually so long as they need the care provided, but have not deteriorated medically to an extent that continuous medical attention is required. Smith & Lee's goal has always been to provide its residents with the security of knowing that Mortenview Manor can become a long-term home for them. For these reasons, the Court concludes that Mortenview Manor is not the equivalent of a rooming house in which transient residents hold no possessory interest in their place of residence.

It is clear that Smith & Lee's use of the Mortenview residence is distinguishable from that of a typical single-family residence in that it is a for-profit enterprise. This excludes its residents from official recognition as a "family" based on a strict reading of section 2.02(36) of the ordinance. The Court does not, however, find this fact to be legally controlling. As was recognized in the first trial, it is just as true that a twelve-person AFC home also does not technically fall within the regular uses of RM–1 property as defined in the ordinance. For purposes of this case, the only truly accurate statement that can be made about Taylor's zoning ordinance is that Mortenview Manor, as an AFC home with twelve residents, would not fall under the City's ordinance anywhere. The home combines residential and commercial uses of a single-family residential home in a unique manner that was neither addressed nor contemplated at the time the ordinance was drafted.

Although large homes for the elderly as well as convalescent and nursing homes are permitted as *special uses* in RM–1 districts, the assumption, endorsed by the City of Taylor, that AFC homes would be more properly located along side these nursing and convalescent homes, rather than next to families, is unsupported by the evidence presented at trial and in direct conflict with the express goals, organizational structure, and functioning of AFC homes. It is the opinion of this Court that the City of Taylor's only justifications for this assumption and for its characterization of mid-sized AFC homes as multiple-family uses are rooted in stereotypical notions and erroneous perceptions about elderly disabled persons and the AFC homes in which many such individuals desire to live.

The Court is aware that for many people, the term "nursing home" conjures up images of sick, elderly persons, confined to small rooms off long, white, corridors patrolled by medical personnel and filled with unfamiliar, often unpleasant odors. Moreover, the Court would agree that this type of large, institutionalized medical facility would be out of place in a quiet single-family neighborhood. However, through the course of this trial, the Court had the opportunity to learn a great deal about AFC homes and other forms of housing offering alternatives for elderly disabled adults who neither require nor desire nursing home care. Through a visit to Mortenview Manor, the Court further enhanced its understanding of the AFC alternative. Based on these experiences, it is now clear to the Court that Mortenview Manor does not, in any meaningful way, resemble a nursing home. From the outside, the home was indistinguishable from any other home in the neighborhood, and displayed no tangible signs of its commercial nature. Inside, it was clean and bright, comfortably furnished, and thoughtfully decorated like a typical family home. It was clear that Smith & Lee had successfully implemented the AFC model discussed by various experts during trial, and was providing its residents with a familiar home-like atmosphere in a quiet, friendly, single-family community where they could receive the care they needed without being subjected to the highly

stigmatized, institutional surroundings of a nursing home.

Based on this experience and the Court's thorough analysis of this issue on remand, the Court concludes that the very characterization of a twelve-person AFC home as "institutional" or "like a nursing home" is evidence of discrimination against handicapped persons. "Intentional discrimination can include actions motivated by stereotypes, unfounded fears, misperceptions, and 'archaic attitudes', as well as simple prejudice about people with disabilities." *Oxford House–C v. City of St. Louis,* 843 F.Supp. 1556, 1575–76 (E.D.Mo.1994); *see also School Board of Nassau County v. Arline,* 480 U.S. 273, 279, 107 S.Ct. 1123, 1126, 94 L.Ed.2d 307 (1987). In deciding that twelve-person AFC homes should be characterized as a multiple-family uses, Taylor City officials ignored the facts— that these homes were based on single-family models, with the primary goal of allowing elderly residents to remain in residential, single-family neighborhoods similar to those in which they spent most of their lives. Instead, Taylor relied on stereotypes, assuming that all forms of housing for elderly people with disabilities would inherently resemble commercial nursing homes, thereby rendering them inappropriate for Taylor's single-family neighborhoods.

Poignant evidence of this form of intentional discrimination was found in the trial testimony of Mr. Gerald Couch, the current Director of Developmental Services for the City, who gave his opinion that an AFC home, even one with only six residents, could never really be like a family home because it was fundamentally commercial. He said that the City is forced to pretend that these 1–6 person homes are not businesses because of the State mandate, but stated his belief to the contrary. Although he agreed that Mortenview Manor, in its present state, does not resemble a nursing home and shows no tangible signs of its commercial nature, he expressed a fear that it might start to care for needier and needier people, making it more like an institution. No foundation was offered to justify that fear. Mr. Couch admitted that Mortenview Manor is externally indistinguishable from every other home in the neighborhood, that the City has never received any complaints about the home, and gave his own opinion that the home had no negative impact on the surrounding neighborhood. He defended his opposition to the home by stating that he was protecting the neighbors who had paid to live in quiet, single-family areas, but admitted that none of the neighbors had opposed Smith & Lee's petition to increase its resident population to twelve at the 1990 hearing before the City Council.

Mortenview Manor is not a nursing home. It is an AFC home, designed to provide an alternative to nursing homes for elderly, handicapped persons who require some daily assistance with living, but choose to live in a single-family residential home in a family-like setting. The City of Taylor was first forced to address the reality of AFC homes when the State of Michigan passed a law requiring municipalities to recognize AFC homes for six or fewer persons as residential entities free to locate in single-family zoned areas. When Smith & Lee forced Taylor to address zoning of slightly larger AFC homes for 7–12 persons, the City had many choices, given the fact that its ordinance offered no guidance on the proper zoning of such homes. In making its choice, the City made no assessment of the goals and day-to-day functioning of AFC homes. Instead it characterized AFC homes with twelve residents as incompatible with surrounding single-family uses, explaining to Smith & Lee, the United States government, and this Court, that the homes were commercial institutions much like nursing or convalescent homes, but not like traditional single-family homes. While this Court recognizes that the Taylor zoning ordinance did not require the City to embrace twelve-person AFC homes, which did not formally fall under the statute's definition of a family, the Court concludes that in requiring that these homes be placed in RM–1 zones where nursing and convalescent homes were allowed as special uses, the City relied on stereotypes about elderly handicapped persons and institutional housing for disabled persons. In the eyes of this Court, Taylor's reliance on stereotypes to justify the segregation of handicapped residents living in twelve-person AFC homes to less desirable,

more commercial neighborhoods in the City is compelling evidence of intentional discrimination in violation of section 3604(f)(1)(B) of the *Fair Housing Act.*

## 2. Disparate Application of City Zoning Ordinance

■ Other evidence of intentional discrimination arises from Taylor's unequal application of its zoning ordinance to AFC homes. The Court agrees with the Sixth Circuit that the City applied the strict language of its zoning ordinance to Mortenview Manor accurately when it concluded that a "for profit" business did not fall under the statutory definition of "family." However, this technically accurate application was nonetheless discriminatory against Mortenview Manor's handicapped residents because this AFC home is the **only** home in Taylor to which the non-profit requirement of the City's ordinance has been strictly and rigidly applied.

A closer examination of the Taylor zoning ordinance clarifies that "for profit" uses of single-family homes are *not* actually excluded by the City. Although the City objects to Smith & Lee profiting from the use of its home, the City allows single-family home owners to rent out their houses for a profit. Also, under the "home occupation" provision of the ordinance, residents in Taylor's single-family areas can conduct businesses out of their homes, so long as the home is used primarily as a dwelling and the business does not create any external nuisances affecting the neighborhood. The actual language of the "home occupation" provision, section 2.02(42) of the Zoning Ordinance, reads as follows:

42. **Home occupation:** Any use customarily conducted entirely within the dwelling and carried on by the inhabitants thereof, not involving employees other than members of the immediate family residing on the premises, which use is clearly incidental and secondary to the use of the dwelling for dwelling purposes, does not change the character thereof, and which does not endanger the health, safety, and welfare of any other persons residing in that area by reasons of noise, noxious odors, unsanitary or unsightly conditions, excessive traffic, fire hazards and the like,

involved in or resulting from such occupation, profession or hobby. Activities not deemed to be home occupations include, among others, medical clinics, hospitals, barber shops, nurseries, day medical clinics, day care centers, beauty parlors, tea rooms, veterinarian's office, tourist homes, animal hospitals, kennels, offices of insurance and real estate agents, lawyers, doctors, accountants, and millinery shops.

Trial testimony revealed that the home occupation provision is intended to strike a balance between the right of individuals to use their homes as they choose, and the right of the City to segregate predominantly residential from predominantly commercial uses through its zoning powers.

In Smith & Lee's case, the City interpreted the language of the home occupation provision to exclude the proposed AFC home solely because the owners do not live in the home. However, the evidence showed that no other home occupation has ever been prohibited solely for this reason. Moreover, the City does not contend that individuals renting a single family home would be prohibited from conducting a home occupation within. Looking to the City of Taylor's overall enforcement of the home occupation provision, it becomes clear that despite fundamental similarities between their home and others, Smith & Lee and the residents of Mortenview Manor have been treated differently from other Taylor homeowners and renters seeking to conduct small businesses out of their single-family homes.

Mr. George Bopp, the Supervising Ordinance Officer for the City of Taylor, testified at trial about the City's enforcement of the home occupation provision. Mr. Bopp's job requires him to traverse the City daily, examining exteriors of homes and yards to ensure that property is maintained and that no nuisances or blatant violations of City ordinances are present. Mr. Bopp testified that he is familiar with the home occupation provision and that he has written up many violations of the provision over his years of service for the City. However, Mr. Bopp explained that he only takes official action to enforce these provisions when he believes, based on an inspection of a home's exterior,

that the health, safety or welfare of the neighbors is jeopardized by a home occupation.

Trial testimony revealed that under the City of Taylor's enforcement scheme, many businesses are tolerated on Mortenview Drive and in other single-family residential neighborhoods in Taylor. The businesses identified to the Court included a welding business, a copying and printing business, a carpet installation business, a painting business and a fruit and vegetable stand. Some of these home occupations had signs posted in the front lawn advertising the businesses in violation of the home occupation provision. However, because the signs did not appear to cause any real harm to the neighborhood, Mr. Bopp allowed them to remain until August of 1994, when his supervisor, Mr. Couch, asked him to remove the signs in preparation for this trial. Mr. Bopp testified that Mortenview Manor has never received a complaint or been written up for a violation of any kind and has always displayed a well-maintained exterior. He also opined that Mortenview Manor's exterior is indistinguishable from the other single family homes on Mortenview. Various City officials confirmed Mr. Bopp's testimony, admitting that compliance with the City zoning ordinance has always been judged based on an **exterior** evaluation of the property. Mortenview Manor, which was repeatedly recognized as a well-maintained, single-family style home indistinguishable from homes surrounding it, was clearly held to a different standard.

Mortenview Manor is similarly situated to other home occupations permitted to exist in Taylor's single-family neighborhoods. Like those lawful home occupations, Smith & Lee's home has not violated any City ordinances, shows no tangible external signs of its "commercial" nature, and is not viewed by City Ordinance Officers to threaten the health, safety, or welfare of the neighborhood in any way. Mortenview Manor is also similarly situated to permitted home occupations in that it functions primarily as a dwelling, and thus displays no tangible conflict with the residential character of the Mortenview neighborhood. Despite these similarities between Smith & Lee's proposed AFC home

and other home occupations permitted in Taylor's residential areas, the City has used the strict language of the zoning ordinance to prohibit Smith & Lee from providing a home for twelve elderly disabled residents. In light of its apathy toward other, more disruptive commercial uses in single-family neighborhoods, the City's refusal to allow Smith & Lee to operate Mortenview Manor with twelve residents in a single-family neighborhood constitutes disparate treatment on the basis of handicap and is compelling evidence of intentional discrimination.

Inconsistent application of the City's zoning ordinance to AFC homes continues to occur. In the original trial on this matter, the City conceded that if a twelve-person AFC home operated as a non-profit organization, it would meet the definition of "family" contained in the zoning ordinance and be permitted to exist in a single-family neighborhood. In September of 1994, just before the trial on remand was expected to begin, the City indicated that this was no longer its position. The City still concedes that if a twelve-person AFC home were non-profit it would meet the definition of "family," but it now asserts that such an AFC home would be prohibited from existing in a single-family neighborhood. The asserted reason for excluding such a non-profit AFC home is the increased "density" that would allegedly result from having twelve persons in the home.

However, the City places no similar restriction on the density of non-disabled persons who live together. The zoning ordinance's definition of "family" permits unlimited numbers of related and unrelated persons to live together so long as they meet the definition of family. Various City officials testified at trial that because there are no cases of twelve unrelated persons living together in a single-family home in Taylor, it has not been forced to consider amending the ordinance. The fact remains however, that the City has declared its refusal to allow a hypothetical non-profit, twelve-person AFC home meeting the definition of family to exist in a single-family area, whereas no similar declaration of intent has been made regarding twelve unrelated, non-disabled persons, who remain free to seek housing in any

Taylor home of their choosing. Such disparate treatment, based on the fact that the residents of AFC homes are disabled, constitutes direct evidence of intentional discrimination. *Stewart B. McKinney Foundation v. Town Plan and Zoning Commission,* 790 F.Supp. 1197 (D.Conn.1992) (application of special use permit process to AFC that met the City's definition of "family" violated the Fair Housing Act.)

### 3. Paternalistic and Discriminatory Statements by Taylor City Officials

■ Other evidence of intentional discrimination includes a number of discriminatory comments made by Taylor City officials throughout these proceedings. For example, at the first trial, the Chairman of the City Council explained his opposition to Smith & Lee's AFC home, stating his belief that AFC homes would have a negative impact on single-family neighborhoods by lowering surrounding property values. However, no evidence was offered in support of this fear, which was shown to be inaccurate and unfounded on remand. The Mayor of Taylor, Cameron Priebe, also testified at trial on remand, explaining that after a decade of exposure to AFC homes with no negative results, Taylor City officials and residents no longer oppose the presence of the homes within the City. However, in making this statement, Mayor Priebe admitted that some of the City's initial opposition to AFC homes was based on irrational fears and prejudices about the dangerous or unstable nature of AFC residents. Evidence that such irrational prejudices and fears remain present in the minds of Taylor City officials was found in the statements of Mr. Gerald Couch, the Executive Director of Developmental Services for the City of Taylor, who testified on remand that he felt it was his duty to protect Taylor's single family homeowners from AFC homes in their neighborhoods. The facts are, however, that the residents of Taylor have not requested such protection, and none of Mortenview Manor's neighbors have objected to Smith & Lee's petition to rezone its property to operate a home for twelve elderly disabled residents.

Courts have also recognized that overt discrimination can be disguised as a desire to protect handicapped persons. *See generally International Union, UAW v. Johnson Controls, Inc.,* 499 U.S. 187, 200, 111 S.Ct. 1196, 1204, 113 L.Ed.2d 158 (1991). One example of such paternalistic discrimination is the statement by a former Taylor City Council Chairman who testified at the first trial that he opposed the 12–person adult foster care home because he feared for the safety of the home's handicapped residents who might have difficulty escaping from a fire. Not only did this individual fail to persuade the Court that safety concerns of this nature were related to the home's presence in a single-family residential neighborhood, he also failed to address the fact that Mortenview Manor and other AFC homes must pass special fire safety inspections before being licensed.

### 4. Historical Discrimination Against the Handicapped

■ Finally, regarding evidence of historical discrimination which the Court relied upon in making its initial ruling, the Sixth Circuit held that evidence about the City's direct opposition to Taylor's first six person AFC home was remote, but relevant to show that discrimination was a motivating factor behind Taylor's refusal to allow Smith & Lee to house twelve residents in 1990. The Sixth Circuit explicitly instructed the Court to consider, as possible rebuttal evidence, that in 1984 the City rezoned property from single-family (R–1A) to multiple-family (RM–1) in order to accommodate a twelve person AFC home known as Beechwood. However, in looking at the circumstances surrounding the rezoning of the Beechwood property, the Court believes that this action fails to rebut plaintiffs' allegations that Taylor has historically discriminated against AFC homes.

First, although the property in which Beechwood is currently located was officially designated R–1A, it was adjacent to an RM–1 multiple-family zone and was not located within a single-family neighborhood like Mortenview Manor. One side of the Beechwood property abuts a large apartment complex, and it lies on a large, wooded lot, isolating it from the single-family homes on its other

side. The evidence on remand established that Taylor rezoned the property in question *not* so that AFC residents would be allowed to live the quiet, single-family neighborhood of their choice, but because it believed that the home would provide a good "buffer" between the single-family neighborhood and the apartment complex. Although the Beechwood incident may show that Taylor has ceased resisting the presence of all AFC homes within its boundaries, it fails to demonstrate that Taylor had ceased attempting to segregate AFC homes from its single-family neighborhoods.

### 5. Conclusion

For all of these reasons, the Court concludes that the City of Taylor's refusal to allow Smith & Lee to operate an AFC home for twelve elderly disabled residents in the Mortenview neighborhood was motivated, at least in part, by discriminatory animus against handicapped persons. Therefore, the City of Taylor has violated section 3604(f)(1)(B) of the Fair Housing Act.

### B. Reasonable Accommodation

To this day, the City of Taylor has not approved any housing for handicapped persons in an area that was not in or adjacent to a less desirable multiple-family zone. Because of the state law allowing six person AFC homes to exist in single-family zones, Taylor's discriminatory policies have not resulted in the total exclusion of handicapped persons from Taylor's single-family neighborhoods. However, this policy has effectively denied a particular group of handicapped persons, the elderly disabled population, equal opportunity to obtain the housing of their choice in single-family residential areas. The evidence presented on remand established that elderly disabled individuals, such as those currently residing at Mortenview Manor, are not reasonably accommodated by the City of Taylor.

The FHAA imposes an affirmative duty to reasonably accommodate handicapped persons. 42 U.S.C. § 3604(f)(3)(B). However, because the precise obligations encompassed by this duty are ambiguous, many courts have looked to the legislative history of the Act for guidance. *See e.g., City of Edmonds v. Washington State Building Code Council,* 18 F.3d 802, 805 (9th Cir.1994), *cert. granted,* —— U.S. ——, 115 S.Ct. 417, 130 L.Ed.2d 332 (1994). At trial on remand in this case, defendant City of Taylor alleged that it met its obligation of reasonably accommodating handicapped individuals by allowing twelve-person AFC homes to exist in the multiple-family zoned areas of the City. The City claims further that it has accommodated Smith & Lee's request to house twelve elderly disabled residents by identifying twelve sites, located throughout the City, which it considers appropriate alternative sites for Smith & Lee's proposed AFC home and other mid-sized AFC homes. Plaintiffs Smith & Lee and the United States have objected to this position, contending that the reasonable accommodation issue before the Court is not whether Taylor will permit Smith & Lee to locate in some reasonable area in the City, but rather, whether Smith & Lee's request to house twelve elderly disabled individuals at Mortenview Manor is a reasonable accommodation under the FHAA.

After thorough examination of this issue, the Court concludes that Plaintiffs have set forth the correct interpretation of the FHAA. In a recent Ninth Circuit opinion addressing this issue, the Court examined the legislative history of the Fair Housing Act and stated as follows:

> The FHAA imposes an affirmative duty to reasonably accommodate handicapped persons.... Congress intended the FHAA to protect the right of handicapped persons to live in the residence of their choice in the community. 1988 U.S.C.C.A.N. at 2185. The FHAA was to "end the unnecessary exclusion of persons with handicaps from the American mainstream." *Id.* at 2179.

*City of Edmonds,* 18 F.3d at 806. In *United States v. Badgett,* 976 F.2d 1176, 1179 (8th Cir.1992), the Eighth Circuit held that the question posed by the reasonable accommodation provision of the FHAA was not whether any housing was made available, but whether housing desired by a member of a protected class was denied on impermissible grounds. Similarly, in *Marbrunak, Inc. v. City of Stow,* 974 F.2d 43, 48 (6th Cir.1992) the court considered whether municipal safe-

ty requirements had "the effect of limiting the ability of these handicapped individuals to live in the residence of their choice." Finally, this interpretation of the FHAA is consistent with the Sixth Circuit's instructions that this Court determine on remand "whether reasonable accommodation under the FHAA requires that Taylor spot zone or amend its neutral zoning ordinance to provide for AFC homes with more than six residents."

To establish a violation of the reasonable accommodation provision of the FHAA, a plaintiff must show that (1) the proposed accommodation is "reasonable," and (2) that the accommodation "may be necessary" to insure equal housing opportunity. 42 U.S.C. § 3604(f)(3)(B). On appeal, the Sixth Circuit held that the state statute requiring Taylor to allow AFC homes for six or fewer residents in its single-family neighborhoods is itself an accommodation for the handicapped, but recognized that this accommodation may be insufficient to meet FHAA requirements. Hence, the narrow question before this Court on remand is whether a need for further accommodation increasing the number of occupants allowed in AFC homes located in single-family neighborhoods from six to twelve is necessary.

To assist this Court's thorough evaluation of the reasonable accommodation issue on remand, the Sixth Circuit opinion offered the following guidance:

> Before deciding whether Taylor must accommodate the handicapped by permitting twelve-person homes, the court must first know if that accommodation is needed to supply a reasonable number of such homes. If the District Court finds that the other six-person homes are non-profit, or that they are able to operate profitably because the homes were rented or purchased at lower costs not now available, then permitting for-profit businesses to supply family housing for the handicapped may be a reasonable accommodation. However, the inquiry should not be whether a particular profit-making company needs such an accommodation but, rather, do such businesses as a whole need this accommodation.

*Smith & Lee*, 13 F.3d at 931. Based on these guiding principles, Plaintiffs presented extensive evidence on remand pertaining to the need for additional AFC homes in Taylor and the economic viability of Mortenview Manor and other similarly situated six-person AFC homes.

On remand, the Court quickly realized that the issues of economic viability and reasonable accommodation in this case could not be based on an evaluation of all AFC homes in the Taylor area. This is because the costs involved in running an AFC vary significantly according to the population served and whether the home must rely solely on private payments from residents to operate. Marjorie Murrell, an Adult Foster Care licensing consultant employed by the DSS, testified that Taylor presently has sixteen AFC homes providing housing for handicapped individuals. However, of these sixteen homes, twelve are "contract" homes, meaning that they receive financial subsidies from state or community agencies. Ms. Murrell explained that these "contracts" are not available for homes serving the elderly disabled population like Mortenview Manor. Therefore, the Court believes that the economic viability of "non-contract" homes like Mortenview Manor cannot be fairly compared to that of "contract" AFC homes receiving external financial support.

Additional complications in assessing the economic viability of AFC homes and determining the need for an additional accommodation in this case were raised by the testimony of Plaintiffs' expert witness Mr. William Lasky, a recognized expert in the development, financing and management of AFC homes. At trial, Mr. Lasky explained that the cost of running an AFC home, as well as the rate that can be charged, varies depending upon the population served and the location of the home. For example, Mr. Lasky explained that most traumatically brain injured patients receive insurance payments for their housing and care; hence an AFC home serving this population would be able to charge higher rates than an AFC home like Mortenview Manor, because most elderly disabled individuals seeking AFC housing rely on fixed incomes to finance their housing

and care needs without external support from insurance or social programs.

Based on this evidence, the Court concludes that the reasonable accommodation issue must be narrowed even further to evaluate whether Mortenview Manor and similarly situated non-contract AFC homes housing the elderly disabled population can exist in reasonable number in the Taylor area without a further accommodation by the City permitting them to house up to twelve residents.

### 1. The Need for Additional AFC Housing for the Elderly Disabled Population

■ In assessing the need for an additional AFC homes serving the elderly disabled population in the Taylor area, the Court begins by recognizing an Amicus Curiae Brief submitted by the American Association for Retired Persons ("AARP")[2] and received by the Court. The brief discusses the rapidly growing number of Americans, age 65 and older, who require alternative housing in which they can receive assistance with activities of daily living without being uprooted from the single-family residential settings in which they desire to live. The AARP's Brief was offered to express its concern over the national shortage of such alternative housing, and its belief that exclusionary zoning and land-use policies have been frequently applied, nationwide, to limit the development of the full range of housing options necessary to meet the needs of older persons.

A report by Plaintiffs' expert Mr. Lasky also recognized the great need nationwide and in this region for housing alternatives serving elderly disabled persons requiring supervision and care, but not 24–hour nursing. Mr. Lasky opined that the shortage in AFC homes for the elderly is caused by the fact that no organized national program provides care for this population, and that Med-

icaid and Medicare do not pay for AFC housing. Other expert witnesses discussed the impact of Alzheimer's disease and other forms of dementia on the elderly population, expressing concern about the growing number of Alzheimer's victims,[3] the suitability of AFC homes for such persons, and the tremendous need for additional AFC homes in Michigan and across the country.

The evidence also established a specific need for additional AFC homes serving the elderly disabled population in the City of Taylor. Since 1980, the elderly population (aged sixty and over) of Taylor has grown rapidly, increasing from 5,992 persons to 8,505 persons, an increase of 42%. This growth in Taylor's senior population contrasts with an overall decrease in Taylor's population during the same time period. Using expert studies designed to assess the need amongst the elderly population for assistance with "activities of daily living" Mr. Lasky assessed Taylor's need for additional assisted living facilities, such as AFC homes, and concluded that at least 877 Taylor residents, aged 65 and over, need assistance with daily living. DSS statistics reveal, however, that Taylor presently has only three AFC homes for the elderly disabled population, with a total of 38 beds. Of the three, all of which are non-contract homes, Mortenview Manor is the only six-person home and the only home located in a single-family neighborhood. The other two homes, known as Beechwood and the Homestead, are larger homes located in RM–1 zones abutting large apartment complexes. During the five years of its operation, Mortenview Manor has maintained a waiting list, having received continuous inquiries from interested residents and their families who viewed Mortenview Manor as their housing of choice, but were turned away because no spaces were available.

2. The AARP is a not-for-profit membership organization of more than thirty-three million persons age 50 and older. Over 1.4 million AARP members live in the state of Michigan. In representing the interests of its members, the AARP seeks to: (a) enhance the quality of life for older persons; (b) promote independence, dignity, and purpose for older persons; (c) advance the role and place of older persons in society; (d) sponsor research on physical, psychological, social,

economic, and other aspects of aging; and (e) support the expansion of alternative housing options for older persons.

3. The expert testimony of Dr. Robert Bernstein revealed that by the year 2030, a 77% increase in the number of older adults with dementia in the State of Michigan is expected.

Based on the extensive evidence submitted, the Court recognizes that there is a shortage of AFC housing for the elderly disabled population in the City of Taylor, and that a substantial number of elderly disabled persons in this area would benefit from the opportunity to live in a supervised home-like setting offered by an AFC.

## 2. Economic Viability of Six Person Homes Serving the Elderly Disabled Population

Based on the evidence presented at trial, this Court believes that the shortage of AFC homes for elderly disabled residents in the City of Taylor is caused, at least in part, by the fact that such homes are not economically viable with only six residents. Because Mortenview Manor is currently the **only** six-person AFC home caring for the elderly disabled population in Taylor, the Court was forced to rely on limited data to evaluate the economic viability of this class of AFC homes. Nonetheless, it became clear to the Court that, on the whole, AFC homes for the elderly disabled population are not economically viable in the Taylor area when limited to six or fewer residents.

Looking first to the long term economic viability of Mortenview Manor itself, additional evidence at the second trial confirmed the Court's original conclusion that Smith & Lee have been unable to make a reasonable profit running Mortenview Manor with only six residents. In fact, over the five years that Mortenview Manor has been in business, it has operated at a loss, surviving only because the four principals of Smith & Lee have continued to transfer personal funds into the corporation to keep the home running. On remand, Defendant City of Taylor attempted to demonstrate that Mortenview Manor is, potentially, an economically viable enterprise with only six residents. However, Defendant was unable to show how Smith & Lee could significantly minimize its costs without negatively impacting the quality of care it currently provides its residents.

Defendant's primary argument was a speculative claim that Smith & Lee could have charged higher rents to increase profit margins over the past five years. Defendant based this argument on the actual and esti-

mated rental rates presented in Smith & Lee's own damage calculations. For example, during much of 1994, Smith & Lee actually charged most of its residents $2000 per month—a rate shown to be comparable to or slightly higher than those charged in the other two AFC homes caring for the elderly disabled population in Taylor. However, in calculating its damages, Smith & Lee estimated that with twelve residents it could have maintained full occupancy by charging $1900/month for each of ten semi-private rooms and $2200/month for each of two private rooms. In arguing that Mortenview Manor is economically viable with six residents, Defendant claims that Smith & Lee could have charged the premium private room rate to all of Mortenview Manor's residents.

The Court rejects this argument as contrary to the evidence. Defendant failed to support this claim with any evidence that the elderly citizens of Taylor could afford to pay these higher rates, or that Mortenview Manor could have maintained full occupancy using Defendant's proposed rate schedule. The testimony of Smith & Lee's officers expressed their belief, based on extensive experience in running AFC homes for the elderly disabled and their familiarity with the Taylor market, that while Mortenview Manor could have attracted a small number of individuals in the Taylor area capable of paying a premium rate for a private room, the home could *not* have maintained high occupancy had Smith & Lee charged this premium rate across the board because most of the residents and prospective residents could not afford the higher rate on their fixed incomes. This testimony is consistent with the expert opinion of Mr. Lasky that the current market rate for AFC homes like Mortenview Manor in Wayne County is between $1800 and $2200/month, with $2200 being a high end rate which much of the population would be unable to pay. Thus, the evidence suggests that Mortenview Manor would not have been able to increase their rates as suggested by Defendant without jeopardizing the home's occupancy level.

Finding no support for Defendant's contention that Smith & Lee could have in-

creased profit margins by charging higher rates, the Court refuses to allow Defendants' speculative assumptions to contradict clear evidence showing that Smith & Lee has not only failed to make a reasonable profit, but has actually **lost** money over the five years it has been forced to run Mortenview Manor with only six residents.

The evidence presented on remand also demonstrated that on the whole, AFC homes like Mortenview Manor housing six or fewer elderly disabled residents are not economically viable. In reaching this conclusion, the Court relied heavily on the testimony of Mr. Lasky who, as the President and CEO of a national provider of assisted living facilities for the elderly, was the only witness identified at trial as an expert in the development, management and financing of assisted living facilities for the elderly population. Moreover, because Mr. Lasky owns many alternative housing facilities serving the elderly disabled population, ranging from 8–bed homes [4] to 132–bed homes, he has had the opportunity to evaluate the economic viability of homes of different sizes, and form an expert opinion on the factors affecting that viability. When he first considered building homes in Michigan, Mr. Lasky researched the markets in Wayne [5] and Oakland Counties, employing a formula designed to assess the need for alternative housing in these areas and the ability of these markets to bear the cost of such housing. Due to the restricted incomes of Wayne County's elderly population, Mr. Lasky chose not to build AFC homes there, and to locate instead in Oakland County, a more affluent area where a greater percentage of the senior citizen population would be able to pay higher rates for housing.

Mr. Lasky agreed with other experts who testified that AFC homes with fifteen or fewer residents located in quiet, single-family homes within single-family neighborhoods were the most desirable form of alternative housing, particularly for individuals suffering from dementia, such as Alzheimer's disease. Nonetheless, he stated that his company had ceased building smaller homes almost completely, due to the impossibility of receiving a reasonable rate of return on such homes. A report, submitted by Mr. Lasky and accepted by the court without objection, states his opinion that it is no longer economically feasible to operate facilities for eight or fewer residents due to the hard and fixed operating expenses of these small homes, leaving them susceptible to any changes in membership and making even short periods of vacancy financially traumatic.

Mr. Lasky opined that while a rare home of eight or fewer residents might make a small profit, on the whole, facilities with eight beds are fewer are not viable because the profits are either non-existent or simply too small and uncertain to create the proper incentives for private individuals and corporations to open such facilities. In response, the defense attempted to demonstrate that economic incentives to operate small-group AFC homes still exist, pointing to the many applications to open 1–6 bed AFC homes currently pending in Michigan. However, they failed to show that any of these new homes intended to care for the elderly disabled population, and therefore failed to rebut Mr. Lasky's expert opinion that non-contract, small-group homes such as Mortenview Manor are not economically viable.

### 3. The Reasonableness of Plaintiffs Proposed Accommodation

Based on the Court's conclusion that the state law permitting 1–6 person AFC homes to exist in single-family neighborhoods does not, in and of itself, provide a reasonable accommodation for elderly handicapped individuals living in the City of Taylor, the Court must next consider whether Plaintiff Smith & Lee's proposed accommodation of allowing Mortenview Manor and similarly situated AFC homes to house twelve residents in Taylor's single-family neighborhoods is "reasonable" under the FHAA. The Sixth Circuit stated that an accommodation is reasonable unless it requires a fundamental altera-

---

4. Many of the original homes owned by Mr. Lasky were in Wisconsin, where a small-group home is defined as 1–8 residents, rather than 1–6, as it is here in Michigan.

5. The City of Taylor is located in Wayne County.

tion in the nature of a program or imposes undue financial or administrative burdens on the defendant. *Smith & Lee Assoc., Inc. v. City of Taylor*, 13 F.3d 920, 930 (6th Cir. 1993). *See also United States v. Village of Marshall, Wis.*, 787 F.Supp. 872, 879 (W.D.Wis.1991) (a reasonable accommodation is one which would not impose an undue hardship or burden upon the entity making the accommodation and would not undermine the basic purpose which the requirement seeks to achieve); *Oxford House–C v. City of St. Louis*, 843 F.Supp. 1556, 1581 (E.D.Mo. 1994) (an accommodation is reasonable if it would not require a fundamental alteration in the nature of a program and would not impose undue financial or administrative burdens on the defendant).

In rejecting this Court's holding that the City of Taylor violated its duty to accommodate by refusing to write a letter of permission to the DSS, the Sixth Circuit identified two possible forms of accommodation available to Smith & Lee: (1) a mandated "spot zoning" of the property to multiple-family zoning; or (2) an amendment of the zoning ordinance removing the profit making restriction with respect to AFC homes like Mortenview Manor. The evidence clearly establishes that neither spot zoning of Smith & Lee's property nor amending the zoning ordinance would impose any significant financial or administrative burdens on the City of Taylor. Various City officials acknowledged their authority to perform these functions and testified that the same basic procedures would be required to implement either accommodation. They also admitted that any costs incurred in the process would be covered by the small fee charged to anyone petitioning the City for an amendment or rezoning.

■ The City of Taylor attempted to show that both proposed accommodations would significantly burden the City by fundamentally altering its zoning ordinance and Master Land Use Plan ("Master Plan"). Various members of the City Council, the Executive Director of Developmental Services, and even the Mayor of Taylor were asked to identify and explain any burdens that would arise from rezoning Smith & Lee's property

or amending the zoning ordinance so that mid-sized AFC homes for the elderly disabled would be permitted in single-family zoned areas. Each individual who testified voiced a fundamental opposition to "spot zoning." They explained that even if Smith & Lee's use of the Mortenview property was not inconsistent with the surrounding property uses, a rezoning of the land could result in future inconsistent uses over which the City would have no control. All witnesses viewed this inability to control the future use of the rezoned property as a burden to the City and a significant interference with its zoning powers.

Because this Court's intention is to insure that the class of handicapped individuals involved in this case are reasonably accommodated in obtaining the housing of their choice, and not to interfere with municipal zoning powers to any greater extent than necessary to meet this goal, the Court accepts the City's objections to "spot zoning" and concludes that a mandated rezoning of Smith & Lee's property to RM–1 would not be a reasonable accommodation in this case.

■ When asked to discuss possible burdens caused by amending the City zoning ordinance, each of defendant's witnesses was presented with a list of proposed amendments offered by the United States and accepted into evidence by the Court. The proposed amendments reflected different ways in which the language of the ordinance could be amended, either by altering the definition of "family" or that of a "home occupation" so that certain AFC homes for handicapped individuals would be included. After making some suggestions of its own, the Court asked witnesses to focus on a narrow amendment to the ordinance's definition of "family" which would permit state-licensed AFC homes for twelve or fewer elderly disabled persons, each identified as "handicapped" under the FHAA, to reside in Taylor's single family neighborhoods. Under such an amendment, none of the other zoning restrictions affecting land use in single-family neighborhoods would be altered. For example, provisions governing height restrictions and the proportional relationship between the size of a dwelling and the land on which it sits would

remain, as would nuisance ordinances prohibiting any home from interfering with the health, safety and welfare of the neighborhood. Each witness was given the opportunity to examine the proposed amendment before being asked to discuss possible burdens it might create. In fact, City Council member Mr. Raymond Basham was asked to take the weekend to consider the proposal, and return to court the following Monday to discuss any burdens he had identified. Even after this reasonable opportunity for reflection, it is the Court's opinion that neither Mr. Basham nor any other Taylor City official was able to identify any tangible burdens that would arise from the proposed amendment.

The one potential burden repeatedly voiced by Defendant's witnesses was a concern that the proposed amendment might cause "density" problems in Taylor's single-family neighborhoods. Unlike the first trial in which City officials claimed that excessive parking and traffic problems would arise if Mortenview Manor were to house twelve residents, various City officials, including Mr. Gerald Couch of the City's Development Office, admitted that Mortenview Manor alone, even with twelve residents, would not significantly impact the parking or traffic flow in the neighborhood. Essentially, Mr. Couch's concerns focused on a potential "flood" of twelve-person homes that would dominate Taylor's single-family neighborhoods if the ordinance was changed, thereby significantly increasing the intended population density of the neighborhoods and affecting things such as parking and traffic. However, Mr. Couch was unable to offer any evidence that such a flood would, or even could occur. He stated his belief that following an amendment of the ordinance, every six-person AFC home in Taylor would immediately attempt to move into a single-family home. However, this fear is easily dismissed by the narrow focus of the proposed amendment, as Mortenview Manor is currently the **only** 1–6 bed AFC home in Taylor housing the elderly disabled population and covered by the proposed amendment.

It is clear to the Court that the City's alleged "density" concerns are nothing more than unsupported, speculative, and irrational fears about Taylor's single family neighborhoods being overwhelmed by AFC homes. Furthermore, the Court believes that the City of Taylor should and could have taken steps to assess the validity of these fears, but simply refused to do so. For example, Taylor chose to spend significant time and money employing its planning consultant, Wade/Trim, to investigate possible alternative sites for twelve-person AFC homes in multiple-family zoned areas. In traversing the City, Wade/Trim could have assessed Taylor's existing single-family homes to determine how many would be appropriate sites for twelve-person AFC homes. Had they taken such steps, Taylor's fears may have been quickly alleviated. Smith & Lee's own search for an appropriate and desirable residence back in 1989 uncovered only a handful of homes which were appropriately designed and large enough to meet their needs, even after renovation. Therefore, it appears unlikely that an amendment of the Taylor zoning ordinance would result in a flood of mid-sized AFC homes for the elderly disabled significantly impacting the "density" of Taylor's single-family neighborhoods. Any claims to the contrary are purely speculative, a fact admitted by two key defense witnesses, Mr. Gerald Couch of the City Development Office and Ms. Emily Palacious, an expert in Urban Planning employed by Wade/Trim.

Regarding Mr. Couch's claim that the proposed amendment would fundamentally alter the City's Master Plan, the Court is again unpersuaded. The substance of this argument is that the Master Plan specifically intended to segregate traditional single-family homes from multiple-family dwellings, such as the many large apartment complexes located throughout Taylor. The flaw with this argument is that neither the Master Plan nor the zoning ordinance address the proper zoning and placement of AFC homes in Taylor. AFC homes for 7–12 residents are not defined as RM–1 dwellings under the zoning ordinance; they are not defined at all. Therefore, in evaluating the possible impact this decision might have on the City's Master Plan, this Court must make a realistic assessment of Smith & Lee's proposed use and

determine if it would be consistent with other single-family uses surrounding it.

As discussed previously, the evidence demonstrates that a single-family home in which twelve elderly disabled residents live together like a family is consistent with more traditional single-family uses. Many AFC residents come to a home when their own families can no longer provide the level of assistance and supervision they need. They seek more than a place to live; they seek comfortable, familiar surroundings, and a surrogate family to provide them with the care they need and the companionship they desire in their final years. Based on the Court's visit to Mortenview Manor and the evidence presented on remand, the Court concludes that Smith & Lee has successfully met its goal of rejecting the nursing home model and establishing an atmosphere where its elderly residents can live like a family in a quiet residential neighborhood, similar to that in which they spent most of their lives. Mortenview Manor's residents eat meals together, watch television and play cards together, do activities together and have grown to care for and depend on one another. They are not transient roomers wandering through town; nor are they like wholly independent adults living in an efficiency apartment complex, sharing the same physical space, but leading independent lives. They are most like a family, and they desire to live on streets like Mortenview Drive for all the same reasons their neighbors do, as well as some unique reasons related to their medical handicaps and elderly status.

Because this Court believes that the use of Mortenview Manor by Smith & Lee and its residents is fundamentally consistent with the single-family uses surrounding it, the Court rejects Defendant's notion that allowing twelve elderly disabled individuals to live at Mortenview Manor would fundamentally alter the City of Taylor's zoning ordinance or Master Plan. Also, because the City of Taylor was unable to identify any other meaningful burdens that would arise from the presence from one, or more than one, mid-sized AFC home in its single-family neighborhoods, the Court holds that Smith & Lee's request for an accommodation allowing them to house twelve elderly disabled residents at Mortenview Manor is reasonable, and must be granted.

### III.

■ After extensive consideration of the facts presented at the first trial and on remand, as well as the Sixth Circuit's opinion in *Smith & Lee Associates, Inc. v. City of Taylor, Michigan,* 13 F.3d 920 (6th Cir.1993), the Court holds that the following relief should be afforded the parties. The Court hereby orders the City of Taylor to amend its zoning ordinance within 30 days of the entry of final judgment in this case, by adding to the definition of family, Ordinance Section 2.02(36), the following:

c. a group of not more than twelve unrelated elderly disabled persons, each of whom is handicapped within the meaning of the Fair Housing Act, 42 U.S.C. Sec. 3602(h), living together as a single housekeeping unit in an adult foster care home licensed by the State of Michigan, with such nonresident staff as may be needed to assist the residents with their daily life activities, but not receiving funding through a contract with any State or community health or social service agency.

By limiting the additional accommodation to mid-sized AFC homes housing no more than twelve elderly disabled individuals, the Court believes that the speculative burdens identified by the City of Taylor, including a significant increase in the "density" of its single-family neighborhoods, can be avoided.

■ Next, the Court holds that the City of Taylor shall pay a civil penalty to the United States in the amount of $20,000.00 pursuant to 42 U.S.C. § 3614(d)(1)(C)(i), which provides that the court "may, to vindicate the public interest, assess a civil penalty against the respondent—in an amount not exceeding $50,000, for a first violation." In response to the $50,000 penalty imposed by this court in its first decision, the Sixth Circuit objected to the Court's failure to provide reasons justifying its imposition of the maximum penalty, and expressed an opinion that "[t]he law as to what accommodation is required [under the FHAA] is too uncertain to penalize the City's conduct." The specific instructions

handed down to this Court were that "[i]f upon remand, the court finds that the City violated the Act and, in its discretion imposes a penalty, it must provide the reasons for deciding on a particular amount."

After revisiting all of the issues and concluding, once again, that the City of Taylor violated the FHAA by intentionally discriminating against and failing to reasonably accommodate a group of elderly handicapped individuals seeking to live in AFC homes in the City of Taylor, the Court concludes that a civil penalty is necessary to vindicate the public interest by sending a strong message to the numerous municipalities likely to face similar issues in the near future. While the Court recognizes that the law on reasonable accommodations under the FHAA remains somewhat uncertain, this cannot excuse Taylor's discriminatory behavior throughout its long battle against Smith & Lee and Mortenview Manor's elderly disabled residents.

Regarding the City's failure to reasonably accommodate AFC homes for the elderly disabled in its single-family neighborhoods, the Court was particularly incensed by the City's failure to make any meaningful inquiries into the purpose and function of AFC homes before characterizing them as multiple-family uses and segregating them from single-family neighborhoods. Similarly, the Court cannot excuse the City's failure to take any steps to assess the validity of its concerns about increased "density" burdens on its single-family neighborhoods before using this speculative argument to justify its discriminatory actions. This failure is particularly offensive because Taylor was more than willing to devote time and money to justify segregating homes for the elderly disabled from its single-family neighborhoods by hiring a private consulting firm to identify twelve "alternative sites" for Mortenview Manor to relocate. The Court honored Defendant's request and viewed these twelve sites, growing more discouraged and insulted as it was taken from one inappropriate parcel of property to another, some located on isolated, wooded lots, but most surrounded by apartment complexes, commercial busi-

nesses, and noisy streets and highways. In selecting these sites, it was clear to the Court that the City of Taylor had given no meaningful consideration to the purpose of an AFC home like Mortenview Manor or the needs and wishes of its handicapped residents.

In imposing a penalty of $20,000, well below the maximum $50,000 allowed under the statute, the Court recognizes the various programs for senior citizens and handicapped persons that the City has helped implement in recent years. The Court also recognizes that prior to this case, the law in this circuit on the duty to accommodate was somewhat ambiguous. However, the Court wishes to convey to the City of Taylor that its "not in my backyard" attitude, reflected in the wide array of insensitive and discriminatory actions taken throughout its long battle to keep AFC homes out of its single-family neighborhoods, is inexcusable and will not be tolerated.

■ The Court finds that the members of Smith & Lee Associates are aggrieved persons under the Act because they have been injured by the discriminatory practices of the City of Taylor. 42 U.S.C. § 3602(i). Therefore, the Court awards them their actual damages of $284,000.00, which represent lost revenue through October 31, 1994 if Smith & Lee had been permitted to operate Mortenview Manor with twelve residents as of April 1, 1990. This calculation of actual damages incorporates a combination of Plaintiffs' and Defendant's calculations. *See* Chart, Appendix A.

This opinion constitutes the Court's findings of facts and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure. A judgment embodying the conclusions of this opinion shall be presented to the Court by Plaintiffs in this matter. Pursuant to Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure, counsel for Plaintiffs Smith & Lee may file a petition for attorney fees within 14 days after entry of judgment.

Appendix A

**Anticipated Gross Revenue With 12 Residents**

<u>1990</u>     $18,200.00 [ (10 residents @ $1,500.00) +
         (2 residents @ $1,600.00) ] for 9 months
            (April 1, 1990 through Dec. 31, 1990)          $   163,800.00

<u>1991</u>     $18,200.00 [ (10 residents @ $1,500.00) +
         (2 residents @ $1,600.00) ] for 12 months
            (Jan. 1, 1991 through Dec. 31, 1991)          $   218,400.00

<u>1992</u>     $22,200.00 [ (10 residents @ $1,800.00) +
         (2 residents @ $2,100.00) ] for 12 months
            (Jan. 1, 1992 through Dec. 31, 1992)          $   266,400.00

<u>1993</u>     $22,800.00 [ (10 residents @ $1,850.00) +
         (2 residents @ $2,150.00) ] for 12 months
            (Jan. 1, 1993 through Dec. 31, 1993)          $   273,600.00

<u>1994</u>     $23,400.00 [ (10 residents @ $1,900.00) +
         2 residents @ $2,200.00) ] for 10 months
            (Jan. 1, 1994 through Oct. 31, 1994)          $   234,000.00
                                       Subtotal:     $ 1,156,200.00

Multiplied by estimated 90% occupancy rate:  <u>TOTAL:</u>  $ 1,040,580.00
<u>Actual Gross Revenue With 6 Residents:</u>          $   572,100.00
**TOTAL GROSS LOSS BEFORE EXPENSES:**          $   468,480.00

## Anticipated Annual Increase in Variable Expenses:

(April 1, 1990 through Dec. 31, 1992)

| | |
|---|---:|
| Liability Insurance: | $ 500.00 |
| Workman's Compensation: | 1,000.00 |
| Payroll: | 23,000.00 |
| Administrative Payroll: | 3,000.00 |
| Payroll Tax: | 2,327.00 |
| Utilities: | 100.00 |
| Food: | 5,000.00 |
| Resident Activities | 3,000.00 |
| Subtotal: | 37,927.00 |
| Per month increase: | 3,161.00 |
| Multiplied by 33 months: | × 33 |
| | $ 104,313.00 |

(Jan. 1, 1993 through Oct. 31, 1994)

| | |
|---|---:|
| Liability Insurance: | $ 1,050.00 |
| Workman's Compensation: | 1,350.00 |
| Payroll: | 31,000.00 |
| Administrative Payroll: | 3,000.00 |
| Payroll Tax: | 3,043.00 |
| Utilities: | 1,000.00 |
| Accounting: | 130.00 |
| Food: | 5,000.00 |
| Resident Activities | 3,300.00 |
| Subtotal: | $ 48,873.00 |
| Per month increase: | 4,073.00 |
| Multiplied by 22 months: | × 22 |
| | $ 89,606.00 |

| | |
|---|---:|
| Increased Expenses for 12 Residents: | $ 93,919.00 |
| Reduced by 5% to reflect assumed vacancy rate: | − 9,696.00 |
| **TOTAL INCREASED EXPENSES:** | $ 184,323.00 |

---

| | |
|---|---:|
| Gross Loss of $468,480 rounded to | $ 468,000.00 |
| Minus Anticipated Increased Expenses of $184,323 rounded to | − 184,000.00 |
| Equals Smith & Lee's Damages: | $ 284,000.00 |